STATE OF NORTH CAROLINA v. RANDALL JACKSON

No. 95A94

(Filed 2 June 1995)

### 1. Evidence and Witnesses § 2302 (NCI4th)— expert testimony—capacity to plan and form specific intent

An opinion by an expert in psychology that defendant's capacity to calmly function and plan was severely impaired because he was intoxicated, was under stress from a previous altercation with the victim, and had a low IQ, if clearly and cogently presented, would be relevant in a first-degree murder trial to show that defendant acted without premeditation and deliberation and could not form the specific intent to kill.

**Am Jur 2d, Expert and Opinion Evidence §§ 193, 194, 362, 363.**

**Admissibility of expert testimony as to whether accused had specific intent necessary for conviction. 16 ALR4th 666.**

### 2. Evidence and Witnesses § 2302 (NCI4th)— expert in psychology—defendant's capacity to form specific intent to kill—opinion excluded

The trial court did not err by excluding a psychologist's expert opinion testimony in a first-degree murder trial that defendant's voluntary intoxication on the night of the murder rendered him incapable of forming the specific intent to kill and of carrying out plans because the psychologist's testimony was, at best, contradictory and equivocal and could not have been helpful to the trier of fact in determining whether defendant specifically intended to kill the victim where evidence presented during a *voir dire* hearing showed that the witness formulated his opinion as to defendant's intoxication without interviewing the officers who were in contact with defendant after his arrest on the morning of the murder; the opinion of the witness could not have been with adequate consideration of defendant's formal confession to the police in which defendant stated that, after he had engaged in a fight, he obtained his shotgun, drove around searching for those with whom he had fought, and took aim with the shotgun and shot the victim because he was the main one who had hit defendant, since the confession was not made available to

the witness until the morning of his testimony; the witness arrived at his opinion without taking into account an officer's testimony that he overheard a telephone conversation by defendant on the morning of his arrest during which defendant said that he had killed a man and meant to kill him; the witness was not aware of a statement made by defendant to a friend shortly before the shooting that "someone is going to die tonight"; and the witness concluded his *voir dire* testimony by admitting that his opinion as to defendant's capacity to form a specific intent to kill would have been different had he been aware of defendant's confession to the police and statements to others before making his assessment.

**Am Jur 2d, Expert and Opinion Evidence §§ 193, 194, 362, 363.**

**Admissibility of expert testimony as to whether accused had specific intent necessary for conviction. 16 ALR4th 666.**

**3. Evidence and Witnesses § 2967 (NCI4th)— denial of witness recall to show bias**

The trial court did not abuse its discretion when it refused to allow defendant to recall a detective to show he was biased in his previous testimony in this first-degree murder trial because he had been disciplined in 1990 for an incident involving the brother of defendant's girlfriend where the detective testified on *voir dire* that he did not know defendant's girlfriend and knew of no relationship between her brother and defendant. The impeachment value of the proffered testimony regarding the unrelated incident was slight if not entirely nonexistent.

**Am Jur 2d, Witnesses § 549.**

**4. Evidence and Witnesses § 1496 (NCI4th)— pipe found under victim's car—irrelevancy—exclusion from evidence**

A chrome bar or pipe recovered from underneath a murder victim's automobile at the scene of the shooting was not relevant in this murder prosecution and was properly excluded as an exhibit where the pipe itself did not impeach eyewitness testimony that no one saw the pipe until after the shooting; defendant did not contend that he acted in self-defense but relied upon the defense that he had no specific intent to kill because he could not premeditate and deliberate; and the fact that the chrome pipe was

underneath the victim's automobile did not tend to make it more or less probable that defendant had no specific intent to kill the victim.

**Am Jur 2d, Evidence §§ 304, 307, 308.**

5. **Constitutional Law § 346 (NCI4th)— exclusion of chrome pipe—right of confrontation not violated**

Defendant's right of confrontation was not affected in this first-degree murder case by the trial court's exclusion of a chrome pipe found beneath the victim's automobile where defendant was able to cross-examine the State's witnesses thoroughly concerning the pipe, the pipe was depicted in photographs admitted into evidence, and defense counsel was able to refer to the pipe during closing argument.

**Am Jur 2d, Constitutional Law §§ 847-849.**

6. **Criminal Law § 113 (NCI4th)— discovery violation—failure to suppress defendant's statement**

The trial court did not err by failing to suppress defendant's statement during a telephone conversation that he had killed a man and meant to kill him as a sanction for the State's violation of discovery by failing to reveal the statement to defense counsel until the fourth day of defendant's murder trial, which was some twenty months after it was overheard by a police detective, where the detective testified that he had not related the statement to anyone before the trial because it was essentially a repetition of defendant's confession which the detective had heard only minutes before the telephone conversation; the State immediately relayed the statement to the defense upon learning of it; and the trial court allowed a continuance in the trial from Thursday until Monday to allow the defense to prepare for the detective's testimony as to this statement. N.C.G.S. § 15A-903(a)(2).

**Am Jur 2d, Depositions and Discovery §§ 426, 427.**

**Statements of parties or witnesses as subject of pretrial or other disclosure, production, or inspection. 73 ALR2d 12.**

7. **Criminal Law § 101 (NCI4th)— telephone statement by defendant—State's failure to reveal before trial—use to impeach expert—no error**

A telephone statement by defendant that he meant to kill the victim was not impermissibly used to impeach defendant's expert

in psychology because it was not revealed to the defense until the fourth day of defendant's murder trial where defendant had made substantially the same statement in his formal confession; defendant had a copy of the confession one and one-half years before trial but elected to keep this information from his expert; by the time the expert testified, the defense was aware of the telephone conversation and had relayed its contents to the expert; and the admission and use of the telephone statement thus did not in any way hinder defendant's defense.

**Am Jur 2d, Depositions and Discovery §§ 428 et seq.**

**Right of defendant in criminal case to inspection of statement of prosecution's witness for purposes of cross-examination or impeachment. 7 ALR3d 181.**

8. **Evidence and Witnesses § 877 (NCI4th)— statement by defendant—hearsay—state of mind exception inapplicable**

Defendant's statement to his girlfriend, when she told him she had heard he had shot someone, that he had shot a gun but had not shot anyone was not admissible under the state of mind exception to the hearsay rule set forth in N.C.G.S. § 8C-1, Rule 803(3) since the statement referred to defendant's actions rather than his state of mind.

**Am Jur 2d, Evidence §§ 556 et seq.**

**Exception to hearsay rule, under Rule 803(3) of Federal Rules of Evidence, with respect to statement of declarant's mental, emotional, or physical condition. 75 ALR Fed. 170.**

9. **Evidence and Witnesses § 930 (NCI4th)— statement by defendant—hearsay—excited utterance exception inapplicable**

Defendant's statement to his girlfriend, when she told him she had heard he had shot someone, that he had shot a gun but had not shot anyone was not admissible under the excited utterance exception to the hearsay rule set forth in N.C.G.S. § 8C-1, Rule 803(2) since the girlfriend's comment to defendant was not a sufficiently startling event, and defendant's response cannot be considered spontaneous because the statement was made five hours after the shooting, and defendant had ample time for reflection and preparation for any confrontation regarding his prior activities.

Am Jur 2d, Evidence §§ 658 et seq.

## 10. Evidence and Witnesses § 979 (NCI4th)— statement by defendant—hearsay—residual exception inapplicable

Defendant's statement to his girlfriend, when she told him she had heard he had shot someone, that he had shot a gun but had not shot anyone was not admissible under the residual exception to the hearsay rule found in N.C.G.S. § 8C-1, Rule 803(24) since the statement did not possess equivalent guarantees of trustworthiness in that it was a self-serving declaration, was not part of the *res gestae*, and was not available for corroborative purposes because defendant did not testify.

Am Jur 2d, Evidence §§ 658 et seq.

## 11. Evidence and Witnesses § 1357 (NCI4th)— defendant's statement to girlfriend—not admissible as part of confession

Defendant's hearsay statement to his girlfriend on the same day he confessed to the police that he had shot a gun but had not shot anyone was not admissible under the principle that, when the State offers part of a confession, the accused may require the entire confession to be admitted into evidence where defendant's statement to his girlfriend was not made at the same time as the confession and was not a part of the confession, and the State did not attempt to introduce testimony concerning defendant's self-serving declaration and thus did not open the door to its admission.

Am Jur 2d, Evidence §§ 658, 659.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Barefoot (Napoleon B., Sr.), J., at the 7 December 1992 Criminal Session of Superior Court, New Hanover County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 13 January 1995.

*Michael F. Easley, Attorney General, by Debra C. Graves, Assistant Attorney General, for the State.*

*Nora Henry Hargrove for defendant-appellant.*

LAKE, Justice.

Defendant was tried capitally for the first-degree murder of Kenneth Marese Murphy. The jury returned with a guilty verdict and recommended a sentence of life imprisonment. We find no prejudicial error and accordingly leave defendant's first-degree murder conviction undisturbed.

At trial, the State presented evidence tending to show that in the early morning hours of 27 April 1991, Kenneth Marese Murphy was fatally shot in the chest outside "Faces" nightclub in Wilmington. Earlier that night, Murphy and his friend, Craig Bonds, went to the campus of the University of North Carolina at Wilmington (UNC-W) to attend a dance. George Bragg, who was acquainted with both the defendant and Murphy, testified that after the dance a fight began between Edward DuBose and Javon Elder in the parking lot. When defendant came outside, he pushed Murphy and they also began to fight. Murphy clearly landed the heavier blows. Murphy attempted to walk away, but defendant followed him and they resumed fighting, again with Murphy getting the better of defendant. Security was called, and the fights were broken up. Bragg further testified that after the fighting ended, he went to McDonald's and while he was there, defendant came in, bloody-faced, asking about Murphy's whereabouts. Someone yelled he was at "Faces," and defendant left.

Meanwhile, Javon Elder, Reggie Flowers, Murphy and Bonds sat in or around their cars in the parking lot of "Faces." Defendant drove past and parked his car. He walked toward the four friends, saying, "Ya'll tried to jump me, ya'll tried to jump me." Murphy offered to fight again, but neither he nor the other men advanced toward the defendant and none had a weapon. Defendant ran back to his car and returned with a shotgun. Upon realizing defendant had a gun, Murphy hid behind the front wheel of Elder's Subaru.

As defendant walked toward them, Herbert Randolph, who considered himself a friend to both sides, stopped his yellow pickup truck between the defendant and the foursome. Randolph testified he thought defendant was angry but he could not tell if defendant was intoxicated. He asked defendant to put the gun away, and defendant responded, "One of them is going to die." Just then, Murphy stood up from behind the Subaru, and defendant shot him in the chest. After the shot was fired, Flowers picked up a chrome pipe and he and Bonds considered rushing the defendant but, afraid defendant was reloading, thought the better of it. Defendant turned, jogged to his car

and drove away, obeying the traffic laws as he left. Bonds, Flowers and Elder put Murphy in the car and drove to the hospital emergency room.

Dr. Walter Gable, a pathologist, testified the gunshot pellets went through the left side of the heart, the stomach, the pancreas and the bowels. It was Dr. Gable's opinion that the victim, with these types of injuries, could have survived only four or five minutes.

Defendant surrendered to police and was arrested outside his girlfriend's apartment at approximately 9:00 a.m. on 27 April 1991. After being advised of his rights, defendant gave a confession. He related that after the fight at UNC-W, he drove to his girlfriend's house to get his shotgun. After retrieving his gun, he set out to find Murphy, first looking at McDonald's and then at "Faces." Defendant told officers he parked his car, confronted Murphy and his friends and then went back to his car, loaded one shell into the shotgun, and walked back toward Murphy. He talked briefly with Herbert Randolph and "then took aim with the shotgun and shot the guy who was standing on the other side of the car. I shot that one because he was the main one who hit me the most times out at UNC-W." At trial, defendant objected to the admission of the confession. The trial court made findings of fact which included that defendant was read his *Miranda* rights; that defendant indicated he understood his rights but chose to waive them; that he was not intoxicated, confused or sleepy; that he was coherent and rational; and that he was calm and showed no remorse for the killing. Thus, the trial court concluded as a matter of law that defendant's confession and waiver were made freely, voluntarily and understandingly. Accordingly, the trial court denied defendant's motion to suppress his confession.

After providing officers with his confession, defendant was escorted to jail by Officer Rodney Simmons, who was present during the confession. En route to the jail, defendant was allowed to place one telephone call. Officer Simmons overheard defendant tell the other party on the telephone that he was at the police station, that he had killed a man, that he meant to kill him, and that no one should worry about coming to get him out of jail because that was where he belonged. Officer Simmons did not reveal this information to prosecutors until the fourth day of trial, explaining he did not do so earlier because the statement was essentially a repetition of defendant's confession, which was, of course, known to defendant and disclosed to his counsel months before trial. When the telephone statement was

brought to their attention, prosecutors immediately informed the defense. The trial court allowed Officer Simmons to testify as to this telephone statement, over defendant's objection, after providing a three-day continuance to allow the defendant time to prepare for the testimony.

Evidence on behalf of the defendant tended to show that Audrey Barnes was at the dance at UNC-W on 26 April 1991. She saw the fight between defendant and Murphy, but not from its beginning. She stated that there were "a lot of other guys" dragging and kicking defendant, who was helped by only one companion. Similarly, Tareka Caison testified that close to five men jumped defendant that night. Barron Bowens testified that as he and defendant left the party, they noticed one of defendant's friends arguing with someone. As defendant walked toward them, he was hit in the face by another man. Defendant fell down, got back up and tried to walk toward the parking lot. Five other men jumped defendant and started fighting him. Bowens became embroiled in the fight himself when he intervened on defendant's behalf.

Edward DuBose testified he and defendant spent the day of 26 April 1991 together and began drinking around 11:30 a.m. By 4:00 p.m., defendant had consumed from six to nine beers. Defendant drank four or five more beers and close to half a flask of gin by the end of the dance. DuBose testified he argued with Murphy and Bonds outside the dance and that Murphy and Bonds hit defendant when he came to intervene.

Further testimony for the defendant came from Regina Clark, his girlfriend and mother of his son. She saw him around 9:30 p.m. on 26 April 1991 and knew he was drinking because he was "passionate" when he drank. About 2:00 a.m. on 27 April 1991, Clark let defendant into her apartment. He ran upstairs, so she went back to bed and later heard him leave. At 3:00 a.m., after letting defendant in again, Clark heard him moaning in the bathroom and checked on him. His mouth was bleeding, and he had wounds on his hands and other parts of his face. There was blood in the sink. Clark further testified that when she took out the garbage that morning, she noticed a uniformed police officer. She so informed defendant. Defendant dressed and went outside to surrender himself. Clark felt that defendant was still intoxicated.

Dr. Howard Grotsky, a psychologist, testified for the defense that he administered several tests to defendant and obtained a history of

the shooting from defendant, Clark and DuBose. Dr. Grotsky testified it was his opinion that defendant was intoxicated and under stress at the time of the shooting. Following the prosecutor's objection to any testimony by Dr. Grotsky regarding defendant's ability to form the specific intent to kill, a *voir dire* was conducted, after which the trial court sustained the prosecutor's objection and suppressed the balance of the expert's testimony.

Defendant brings forward five assignments of error.

I.

In his first assignment of error, defendant contends the trial court committed reversible error when it suppressed that portion of the opinion testimony of Dr. Grotsky which related to defendant's ability to formulate and carry out plans on the night of the murder. Defendant argues that this expert's testimony in this area was critical to his defense and should have been allowed on the basis that the objection to it more properly went toward weight rather than admissibility. He contends he was thus deprived of the right to present a defense in violation of the state and federal constitutions and our Rules of Evidence. The State counters that this portion of this expert's testimony was so convoluted, contradictory and equivocal that it would confuse rather than aid the jury and was thus properly excluded.

Dr. Grotsky was tendered as an expert witness and was so accepted by the trial court without objection. During direct examination, Dr. Grotsky testified that in developing his clinical evaluation of defendant, he examined him on three separate occasions and administered an intelligence test as well as a personality measure. Dr. Grotsky also interviewed the policemen in contact with defendant at the jail; the defendant's girlfriend, Regina Clark; and defendant's friend, Edward DuBose. The intelligence test revealed defendant had a full scale IQ of 77, placing him, according to Dr. Grotsky, in the borderline category of intelligence between average and retarded. Further, Dr. Grotsky relayed to the jury that he learned defendant had been drinking before the murder and concluded defendant was under stress at the time of the murder. When defense counsel attempted to question Dr. Grotsky as to his opinion on whether defendant's voluntary intoxication rendered him incapable of forming the specific intent to kill, the State requested and was granted a *voir dire*. Upon conclusion of the *voir dire*, the trial court granted the State's motion to suppress that portion of the testimony of Dr. Grotsky relating to

defendant's ability to formulate specific intent and to carry out plans, and defendant objected and excepted.

In order to gain a conviction for first-degree murder, the State must prove beyond a reasonable doubt that defendant killed the victim with malice, after premeditation and deliberation. N.C.G.S. § 14-17 (1993); *State v. Keel,* 333 N.C. 52, 423 S.E.2d 458 (1992), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 147 (1995). Deliberation means "an intent to kill, carried out in a cool state of blood in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *State v. Barts,* 316 N.C. 666, 687, 343 S.E.2d 828, 842 (1986).

The admissibility of evidence is first governed by Rule 401 of the Rules of Evidence, which defines relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Rule 702 sets the standard for the admissibility of expert opinion testimony, specifying that a witness qualified as an expert may testify as to scientific, technical or other specialized knowledge *if* such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." N.C.G.S. § 8C-1, Rule 702 (1992).

[1] As an expert witness in the field of psychology, Dr. Grotsky was, by education and training, in a better position than the trier of fact to evaluate whether defendant could formulate a specific plan or intent to kill. *See State v. Wilkerson,* 295 N.C. 559, 247 S.E.2d 905 (1978). Any opinion held by Dr. Grotsky, as an expert, to the effect that the defendant's capacity to calmly function and plan was severely impaired because he was intoxicated, was under stress from the previous altercation with Murphy, and had a low IQ, would be evidence which arguably would tend to show defendant acted without premeditation and deliberation and could not form the specific intent to kill. *See State v. Shank,* 322 N.C. 243, 367 S.E.2d 639 (1988). Such testimony, if clearly and cogently presented, would be plainly relevant in a first-degree murder trial. The determining factor then, as to this issue, is whether Dr. Grotsky adequately demonstrated to the trial court on *voir dire* that, through his appropriate consideration of relevant data, he was able to form *and hold* an opinion as to defendant's

capacity and then *articulate* that opinion in such manner that it could "assist the trier of fact to understand the evidence or to determine a fact in issue." N.C.G.S. § 8C-1, Rule 702.

**[2]** During the *voir dire*, the State first showed that the doctor formulated his opinion as to defendant's intoxication without interviewing the officers who were in contact with defendant on the morning of his arrest. Instead, the doctor's opinion was based upon conversations with the defendant; his girlfriend, Regina Clark; and his friend, Edward DuBose. Dr. Grotsky acknowledged that speaking with the arresting officers would have influenced his opinion on defendant's intoxication and its impact on defendant's capacity to form specific intent.

Second, the *voir dire* revealed the doctor arrived at his opinion without fully considering statements made by defendant evidencing that indeed defendant did possess a specific intent to kill Murphy. Dr. Grotsky's opinion did not take into account Officer Simmons' testimony that he overheard defendant's telephone conversation the morning of his arrest during which defendant said that he had killed a man, that he meant to kill him, and that no one should worry about coming to get him out of jail because that was where he belonged. Dr. Grotsky acknowledged that if these statements were indeed made by defendant, this would alter his opinion.

Additionally, the *voir dire* revealed that Dr. Grotsky was not aware of the statement made by defendant to Herbert Randolph, the friend who tried to intervene just before defendant shot Murphy, that "someone is going to die tonight," and further that Dr. Grotsky's opinion could not have been formed with adequate consideration of defendant's formal confession to police, since the confession was not made available to the doctor by defense counsel until the morning of his testimony. In his confession, defendant acknowledges that after the fight, he first went to Clark's house and got his shotgun and then drove around in his car searching for the people with whom he had fought. After locating these people and walking up to them, the confession states: "I then took aim with the shotgun and shot the guy who was standing on the other side of the car. I shot that one because he was the main one who hit me the most times out at UNC-W." Dr. Grotsky explained that while that portion of the confession certainly appeared to be indicative of specific intent, this was contradictory to defendant's explanation of the shooting during their interviews. He

testified that defendant had told him he shot in a "knee-jerk" fashion to the movement of Murphy suddenly standing up from behind the car.

In the *voir dire*, defense counsel attempted to rehabilitate Dr. Grotsky, who indicated that, notwithstanding all the information he had not considered coupled with his concern about defendant's truthfulness in their interviews, his initial opinion concerning defendant's ability to form the specific intent to kill was unchanged. The doctor testified that "[defendant's] ability to function and to think through and plan was severely impaired." He further stated:

> What I am trying to say is that he was severely impaired, unable to understand the implications of his actions, unable to formulate or think logically.

In response to defense counsel's question as to whether, in his opinion, defendant suffered from a diminished mental capacity such that he could not specifically intend to kill, Dr. Grotsky responded:

> I would say that there is a strong probability that's true. I don't know that for a hundred percent. No one knows that for a hundred percent.

Regarding defendant's capacity to carry out plans, the doctor stated:

> Well, he could, obviously think about plans because obviously, there was a series of actions that he followed. What I feel he wasn't able to do is understand the consequences of those plans.

When asked by defense counsel whether defendant's mind and reason were so completely overthrown by his voluntary intoxication as to render him utterly incapable of forming *the specific intent* to kill, Dr. Grotsky's response was:

> I think that is a very strong possibility that he was *unable to think rationally and logically* on that evening.

(Emphasis added.)

When asked by the district attorney if he was engaging in speculation, the doctor replied:

> I don't know if it is speculation. It is based on my talking with Mr. Jackson, and also talking with his girlfriend, Regina Clark, who described his behavior as he was intoxicated.

Toward the end of the *voir dire,* Dr. Grotsky testified as follows:

Q.   You talk about impairing his judgment. We are talking about the capacity to form the specific intent to kill. Do you understand that?

A.   Okay.

Q.   We are not talking about whether his decision making was good or bad. Are you talking about his decision making ability?

A.   Let me try. The capacity, was he capable of premeditating, was he capable of . . . .

Q.   Was he capable of forming the specific intent to kill somebody?

A.   Certainly that's a possibility. I can't say he wasn't capable. Given the facts you gave me today, it makes it a mere more likely than not that he was capable.

A short while later, the trial court interjected the following:

THE COURT: Doctor, let me see if I understand exactly what you're saying. Your opinion is based on the information that you had?

A.   Correct.

THE COURT: If you had other information that you have here this morning, such as the confession and so forth, then your opinion would probably be different?

A.   Significantly different.

This witness concluded his testimony on *voir dire* by admitting that his opinion as to defendant's capacity to form the specific intent to kill would have been different had he been aware of defendant's confession to the police before making his assessment. It is clear from Dr. Grotsky's testimony that he doubted his own opinion.

In light of the foregoing, we conclude that this expert opinion testimony, at best, was contradictory and equivocal and could not have been helpful to the trier of fact in making the determination of whether defendant specifically intended to kill the victim. It is analogous to that expert opinion testimony which this Court found was properly excluded in *State v. Clark,* 324 N.C. 146, 160, 377 S.E.2d 54,

62-63 (1989). Even assuming, *arguendo*, some slight probative value in this testimony, in light of defendant's unequivocal confession and the additional overwhelming evidence that he not only thought about killing Murphy but tracked him down and would let no one dissuade him from his purpose, we find the suppression of this portion of Dr. Grotsky's testimony to be harmless beyond a reasonable doubt. This assignment of error is overruled.

II.

**[3]** Defendant next argues that the trial court erred when it refused to allow defendant's recall of Detective Simmons as a witness for the purpose of attempting to show that the detective was biased in his previous testimony, because of a prior disciplinary measure resulting from his assault on the brother of Regina Clark, defendant's girlfriend. We cannot agree.

Detective Simmons had testified, as a witness for the State, that on the morning of defendant's arrest, just after defendant made a formal confession, he overheard defendant's telephone conversation in which he related that he had killed a man, that he meant to do it, and that no one should worry about getting him out of jail because that was where he belonged. During defendant's case-in-chief, the defense requested they be allowed to recall Simmons to question him about a prior disciplinary measure against him, indicating to the trial judge that they were unaware of the incident when Simmons testified earlier. A *voir dire* was held, and Detective Simmons related he once arrested a man named Corey Clark for felonious possession of cocaine. In January of 1990, Simmons removed Clark, unhandcuffed, from jail. When Clark broke free, an altercation occurred between the two, and Simmons struck Clark in the face. As discipline, Simmons was given two days' unpaid leave for unprofessional conduct. Simmons further testified he had not seen Corey Clark since 1990, that he knew of no relationship between Clark and defendant, and that he did not know Regina Clark. The trial court declined to allow this testimony before the jury.

Evidence tending only slightly to prove bias may be admitted; however, rejecting such evidence is within the discretionary power of the trial court. 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 157 (4th ed. 1993). It is clear from the *voir dire* of Detective Simmons that the impeachment value of the proffered testimony regarding this unrelated incident is slight, if not entirely nonexistent. Simmons testified he had no contact with Corey Clark

after 1990 and was unaware of the relationship between Corey and Regina Clark and the defendant. This very relationship is what defendant claims provides the source for bias. As the link between Corey Clark and defendant is speculative at best, we conclude this evidence was properly excluded. *See State v. Baker*, 320 N.C. 104, 357 S.E.2d 340 (1987); *State v. Porth*, 269 N.C. 329, 153 S.E.2d 10 (1967). This assignment of error is without merit.

## III.

[4] In his third assignment of error, defendant contends the trial court erred by refusing to admit into evidence a chrome bar or pipe recovered from underneath Murphy's automobile at the scene of the shooting. Defendant contends this pipe was admissible as an exhibit to impeach the State's witnesses regarding their testimony of events at the time of the shooting. We disagree.

Murphy's friends at the scene of the shooting testified as eyewitnesses for the State and denied they had taken part in the fight at UNC-W between defendant and Murphy. Defendant's witnesses testified that defendant was beaten by four or five men. During defendant's cross-examination of Murphy's friends, each admitted to seeing a chrome bar; but each denied seeing it at the time of the shooting, and each denied picking up or using the bar before the shooting. Reggie Flowers testified the pipe was lying underneath Murphy's car, and he picked it up after defendant shot Murphy because he thought about rushing defendant but decided against this since defendant still held the shotgun. The pipe was visible in the State's photograph exhibits which were admitted into evidence showing the position of the automobiles at the time of the shooting.

The fact that a pipe, which according to the State's eyewitnesses was neither used nor noticed by anyone prior to the shooting, was on the ground under the victim's automobile does not serve to establish that these eyewitnesses were part of the earlier fight at UNC-W or that it had any relevance with respect to the events which occurred at the time of the shooting. The pipe itself, as an exhibit, does nothing to impeach the eyewitness testimony that no one saw the pipe until after the shooting. The defendant did not testify, and his defense did not in any way hinge upon a theory of self-defense. Rather, it was premised upon the contention that defendant, for various reasons, had no specific intent to kill. No witness, for the State or the defense, put the pipe in the hands of anyone prior to the shooting. The fact that the chrome pipe was underneath Murphy's automobile before the

shooting does not tend to make it more or less probable that defendant had no specific intent to kill Murphy because he could not premeditate and deliberate. Furthermore, this fact does nothing to impeach the testimony of the eyewitnesses who said they had no weapon of any kind at the time of the shooting. Thus, the pipe itself was not relevant and was properly excluded as an exhibit. Evidence not relevant is not admissible. N.C.G.S. § 8C-1, Rule 402; *State v. Cashwell*, 322 N.C. 574, 369 S.E.2d 566 (1988).

[5] Finally, defendant's right of confrontation was not affected by the exclusion of the pipe as an exhibit. Defendant acknowledges he was able to cross-examine each of the State's witnesses thoroughly concerning the pipe. Further, the pipe was depicted in photographic evidence which was admitted, and defense counsel was able to refer to the pipe during closing argument. Thus, the exclusion of the pipe did not implicate defendant's right to confrontation of witnesses, but merely prevented defense counsel from holding the pipe in front of the jury during closing argument. We conclude there is no reasonable possibility that a different result would have been reached at trial had this pipe been received as an exhibit. N.C.G.S. § 15A-1443(a) (1988). This assignment of error is without merit.

IV.

[6] As a fourth assignment of error, defendant argues it was error for the trial court to allow the State to introduce Detective Simmons' testimony concerning the statement he overheard defendant make on the telephone after his confession, and later to allow the use of this testimony for the impeachment of Dr. Grotsky. Defendant contends the telephone statement should have been suppressed, at least as to its use in impeaching the testimony of his expert, as a sanction for the State's violation of discovery in not revealing the statement until the fourth day of trial, some twenty months after it was made.

Defendant made his formal confession on the morning of his arrest. Detective Simmons was present. After defendant had gone through his confession twice with the officers, Simmons escorted him to jail. En route, defendant asked to place a telephone call. Simmons overheard defendant's part of the conversation which was, in essence, that defendant had killed a man and that he meant to kill him. Simmons testified that he had not considered the statement on the telephone important, and so had not bothered to relate it to anyone earlier because it was essentially a repetition of defendant's confession which he had heard only minutes before. It occurred to him

during the trial that it might be important, and he then related it to the prosecutor who, in turn, notified defense counsel. The trial court allowed a continuance in the trial from Thursday until Monday to allow the defense to prepare for the testimony of Detective Simmons as to this statement and overruled defendant's objections to the testimony.

The discovery statute, N.C.G.S. § 15A-903(a)(2), in pertinent part, requires that upon motion by a defendant, the trial court must order the prosecutor to divulge the substance of any relevant oral statement made by the defendant when the existence of such statement is known or becomes known to the prosecutor "prior to or during the course of trial." N.C.G.S. § 15A-903(a)(2) (1988). Determining whether the State failed to comply with discovery is a decision left to the sound discretion of the trial court. *State v. McClintick*, 315 N.C. 649, 340 S.E.2d 41 (1986). Sanctions, if any, for failure to comply with discovery requests are left to the sound discretion of the trial court and are not reviewable on appeal absent abuse of discretion. *State v. Weeks*, 322 N.C. 152, 171, 367 S.E.2d 895, 906 (1988).

While the trial court issued no formal findings of fact and conclusions of law concerning whether N.C.G.S. § 15A-903(a)(2) was in fact violated, the record is sufficient to show that the trial court considered defendant's arguments in light of the discovery statute. On at least two instances, references were made to N.C.G.S. § 15A-910, which contains a listing of appropriate sanctions for noncompliance with the discovery article. The trial court also referred to the fact that the defendant's telephone conversation was "just corroborating what the [defendant] already said upstairs five minutes before" and further stated that "[the D.A.] was almost in a trot to let you know that this man made this statement to [the officer]." Since the State immediately relayed the substance of the statement to the defense upon learning of it, we find no abuse of discretion by the trial court in refusing the requested sanctions and no error in the admission of the testimony.

Even assuming *arguendo* that the State failed at least technically to comply with the discovery statute, N.C.G.S. § 15A-910(2) allows the trial court, in its discretion, to grant a continuance in such cases. The trial court did grant the defendant a continuance from Thursday until Monday to allow the defense time to prepare for testimony concerning the telephone conversation. Under these circumstances, the trial court afforded the defense opportunity to meet this evidence.

[7]  Defendant further contends the telephone statement was impermissibly used to impeach his expert witness, Dr. Grotsky. During his formal confession, made just a short while before his telephone conversation, defendant revealed that he meant to kill Murphy. Defendant had a copy of his formal confession approximately one and one-half years before trial but, for reasons best known to him, elected to keep this information from his own expert. During *voir dire*, Dr. Grotsky stated that he first read the content of the confession the morning he was to testify. Because the two statements were identical in substance, defendant has no basis for now arguing that the admission and use of the telephone statement in any way hindered his defense. Defendant simply failed to adequately prepare his expert with the relevant information that had been in his possession for twenty months. A defendant is not prejudiced by any error which may have resulted from his own conduct. N.C.G.S. § 15A-1443(c). Furthermore, by the time the expert testified, the defense was aware of the telephone conversation and, according to Dr. Grotsky's *voir dire* testimony, had relayed its cumulative contents to Dr. Grotsky. This assignment of error is without merit.

V.

Finally, as his fifth assignment of error, defendant contends the trial court erred by refusing to allow defendant's girlfriend, Regina Clark, to testify concerning a conversation the two had about the shooting, apparently just prior to his arrest the morning of the shooting. We do not agree.

On *voir dire*, Regina Clark testified that she received a telephone call about the shooting at approximately 8:00 a.m. on 27 April 1991. Clark testified that when she told defendant she heard he had shot someone, he looked stunned and replied that he had shot a gun, but that he had not shot anyone. It is this statement that defendant contends was improperly excluded. We note in this regard that Clark also testified that she thought defendant was still intoxicated when he walked out of her apartment to surrender to police at 9:00 a.m.

While conceding that this proffered testimony would be hearsay, particularly since he elected not to testify himself, defendant asserts it constitutes admissible hearsay under an assortment of three exceptions to the hearsay rule. We find that none of these are applicable to the defendant's statement.

[8]  First, defendant urges that his remark meets the then-existing state of mind exception in N.C.G.S. § 8C-1, Rule 803(3). We conclude,

however, that defendant's statement did not reference a state of mind but rather referred to his actions. Defendant did not state that he did not mean or intend to shoot anyone, but rather, he simply remarked that he did not shoot anyone. His state of mind is neither revealed nor implicated in this straightforward recantation of events.

**[9]** Next, defendant contends the statement meets the excited utterance exception in N.C.G.S. § 8C-1, Rule 803(2). We are not so persuaded. Clark's questioning comment to defendant that she heard he had shot someone was not a sufficiently startling event, and defendant's response cannot be considered spontaneous. *See State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985). Murphy was killed at approximately 2:30 a.m., and defendant allegedly made his statement around 8:00 a.m. Defendant was with Clark during several of these intervening five hours, yet he said nothing about shooting a gun. The trial court could properly conclude that defendant had ample time for reflection and preparation for any confrontation regarding his prior activities. In the context in which it was made, more than five hours after the event, we decline the invitation to characterize this statement as a response to a startling event or as an excited utterance.

**[10]** With respect to his third proposition, defendant submits the statement qualifies for admission under the residual hearsay exception found in N.C.G.S. § 8C-1, Rule 803(24). Again, we disagree since the statement, in the context made, does not possess the equivalent guarantees of trustworthiness that must form the bedrock of this exception. The statement was a self-serving declaration, not part of the *res gestae*, and it was not available for corroborative purposes since defendant did not testify. *State v. Pearce*, 296 N.C. 281, 250 S.E.2d 640 (1979); *State v. Taylor*, 280 N.C. 273, 185 S.E.2d 677 (1972).

**[11]** In addition to these three asserted hearsay exceptions, defendant now further proposes that the hearsay statement was admissible because the State introduced the defendant's confession which was made on the same day. Defendant's argument in this regard appears to invoke the principle that when the State offers a part of a confession, the accused may require the entire confession to be admitted into evidence. *State v. Davis*, 289 N.C. 500, 223 S.E.2d 296, *death sentence vacated*, 429 U.S. 809, 50 L. Ed. 2d 69 (1976). However, the difficulty with this proposition is that while the confession and the statement allegedly made to Clark were made on the same day, they were not made at the same time. The alleged statement to Clark was not a part of the confession. For such a contended premise to exist,

the State must open the door to the later self-serving statement in order for it to gain admission. *Weeks*, 322 N.C. at 168, 367 S.E.2d at 905. After a thorough review of the record, we are satisfied that the State did not attempt to introduce testimony concerning the self-serving declaration at any time. The cross-examination of Regina Clark concerning defendant's activities after the shooting is insufficient to open the door, as it failed even to touch upon the statement. This assignment of error is overruled.

For the foregoing reasons, we conclude that defendant received a fair trial, free from prejudicial error.

NO ERROR.