STATE OF NORTH CAROLINA v. MICHAEL THOMAS BROWN

No. 132A92

(Filed 28 January 1994)

## 1. Evidence and Witnesses § 981 (NCI4th)— murder—statement of unavailable witness—excluded—no error

The trial court did not err in a noncapital prosecution for first-degree murder by excluding statements made by a codefendant, Williams, where defendant wished to use the statements to show that defendant was not an integral part of the plan to kill a police officer; Williams, who had not yet been tried, repeatedly invoked the Fifth Amendment when called by defendant; and the trial court ruled that Williams was unavailable as a witness, that the statements were against his penal interest when made and that they were made voluntarily, but that they bore insufficient indications of trustworthiness. The trial court's determination that the statements made by Williams were not trustworthy is well supported by the record. N.C.G.S. § 8C-1, Rule 804(b)(3).

**Am Jur 2d, Evidence § 1081.**

## 2. Constitutional Law § 346 (NCI4th)— murder—statement of unavailable witness—exclusion—not violation of due process or right to confrontation

The trial court did not err in a noncapital first-degree murder prosecution by excluding pretrial statements of a codefendant who had not yet been tried and who invoked the Fifth Amendment when called by defendant. The rationale underlying the award of a new trial in *Chambers v. Mississippi*, 410 U.S. 284, does not apply because the trial court here ruled that the statements at issue did not have the assurances of trustworthiness found in the rejected testimony in *Chambers*.

**Am Jur 2d, Criminal Law §§ 921-923.**

## 3. Evidence and Witnesses § 90 (NCI4th)— murder—statements of nontestifying witness—exclusion—no error

The trial court did not err in a noncapital murder prosecution by excluding under N.C.G.S. § 8C-1, Rule 403 the pretrial statements of a codefendant who had not yet been tried who invoked the Fifth Amendment when called by defendant where

STATE v. BROWN

[335 N.C. 477 (1994)]

the probative value of the statements was slight and the trial court specifically found the statements to be untrustworthy. The admission of a statement that is so clearly false and that was made by a witness who is unavailable to testify or be cross-examined would have been misleading to the jury.

**Am Jur 2d, Evidence § 260.**

4. **Criminal Law § 537 (NCI4th) — murder — display of victim's photograph by victim's daughter — no mistrial**

The trial court did not err in a noncapital first-degree murder prosecution by denying a mistrial where the victim's daughter displayed a photograph of the victim during the defendant's cross-examination. The trial court conducted a voir dire examination of the bailiff and the juror who reported the incident, instructed the jury, and recessed for the remainder of the afternoon. There is nothing to indicate that any of the jurors were influenced in any way by the photograph or that defendant was prejudiced. N.C.G.S. § 15A-1061.

**Am Jur 2d, Trial §§ 39 et seq.**

5. **Evidence and Witnesses § 2152 (NCI4th) — murder — testimony by psychiatric expert — ability to conspire — excluded**

The trial court did not err in a noncapital first-degree murder prosecution by excluding testimony from an expert in forensic psychiatry that defendant lacked the mental capacity and ability to conspire. An answer to the question objected to would have required the witness to have knowledge of the legal elements necessary for entrance into a conspiracy and knowledge of the substantive legal definition of a conspiracy. Testimony concerning the type of person or personality necessary to enter into a conspiracy would be fraught with substantial risk of confusing or misleading the jury.

**Am Jur 2d, Expert and Opinion Evidence §§ 136 et seq.**

6. **Criminal Law § 753 (NCI4th) — murder — requested instructions — given in substance**

The trial court did not err in a noncapital first-degree murder prosecution in its instructions on conspiracy and aiding and abetting where the court charged in substantial conformity with defendant's requested instruction.

**Am Jur 2d, Trial §§ 754 et seq., 827 et seq.**

STATE v. BROWN

[335 N.C. 477 (1994)]

**7. Criminal Law § 775 (NCI4th)— murder—voluntary intoxication—instruction refused—no error**

The trial court did not err in a noncapital first-degree murder prosecution by refusing to give the requested instruction on voluntary intoxication where defendant's evidence showed that he had consumed ten or eleven beers on the evening of the murder and his expert testified that defendant's drinking could have caused an "accumulative impairment of mental functions," that defendant would have been acutely intoxicated at the time of the murder, and that his capacity to plan and have good judgment would have been adversely affected. The evidence suggests that defendant was intoxicated to some degree, but nothing in the record suggests that his degree of intoxication approached the level necessary to support an instruction on the defense of voluntary intoxication.

**Am Jur 2d, Trial § 743.**

**8. Evidence and Witnesses § 2954 (NCI4th)— murder—defense expert provided by court—impeachment—payment of fee**

The trial court did not err in a noncapital murder prosecution by allowing the State to impeach a defense expert concerning the witness's fee where the expert was provided by order of the court and was being paid with State funds. Defendant was free to demonstrate through redirect examination that the circumstances surrounding the retention and payment of the witness were such that the jury would have inferred no bias on his part.

**Am Jur 2d, Witnesses § 554.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Cashwell, J., at the 4 November 1991 session of Superior Court, Brunswick County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments entered on other felony convictions was allowed by the Supreme Court on 13 May 1993. Heard in the Supreme Court 17 November 1993.

*Michael F. Easley, Attorney General, by Thomas S. Hicks, Assistant Attorney General, for the State.*

*Nora Henry Hargrove for defendant-appellant.*

MEYER, Justice.

On 15 July 1991, a Columbus County grand jury indicted defendant for first-degree murder, conspiracy to commit murder, robbery with a firearm, and conspiracy to commit robbery with a firearm. Defendant was tried capitally in the Superior Court, Brunswick County, in November 1991 and was found guilty as charged in each case, the jury specifically finding defendant guilty of first-degree murder based on malice, premeditation, and deliberation; felony murder; and lying in wait. Upon a jury recommendation, defendant was sentenced to life imprisonment for first-degree murder. Judge Narley L. Cashwell imposed consecutive sentences totalling seventy years for the other offenses.

Although inconsistent and at times conflicting, the evidence presented at trial tended to show the following: On the afternoon of 17 June 1991, defendant's friend, Aquino Williams, showed up at defendant's house to retrieve a .22-caliber pistol that he had handed over to defendant the night before. The pistol, which Williams had recently stolen from a tavern in the area, had belonged to the owner of the tavern, Vern Bellamy. Williams had shown the weapon to defendant and had stated that he was going to use it to kill a police officer so that Williams could steal the police officer's weapon. Williams left defendant's house, and defendant did not see him again until 6:00 that evening when Williams returned to defendant's house, and the two men left for Tammy Clark's house. Defendant drank two beers at Clark's house, then he and Williams returned to defendant's home. After they had been at defendant's home for about ten minutes, Shane Shipman arrived, and the three of them talked and watched T.V. until about 8:30 or 9:00 p.m. At that time, Williams and Shane Shipman left to go to Vern Bellamy's tavern. Some time later, Lee Shipman and Jeff Moore showed up at defendant's house. Defendant gave them $8.00 to buy some beer; they left and returned about fifteen minutes later. The three men carried the beer to a park across from defendant's house and began to drink it. After defendant drank about five of these beers, they all went to Tammy Clark's house. Once there, defendant drank about four more beers. At around 10:00 p.m., Williams arrived at Tammy Clark's house with Shane Shipman and Deautry Toon. Around 11:00 p.m., Williams, Shane Shipman and defendant left Tammy Clark's house and returned to defendant's house. They returned to Tammy Clark's house at around 11:45 p.m. After Tammy told them that she was going

STATE v. BROWN

[335 N.C. 477 (1994)]

to bed, defendant and the two others went to their homes. Williams showed up again at defendant's home at around 12:15 a.m. Williams went to defendant's room and told defendant that he wanted to kill a cop. He told defendant to go to the nearby Timesaver convenience store and call in a fake breaking and entering report. Defendant and Williams walked together to the Timesaver, where defendant called the Sheriff's dispatcher and, identifying himself as John Norris, told the dispatcher that there was a break-in at the sixth house on the right on Mill Pond Road. The dispatcher radioed this information to Corporal Hinson, who was on patrol in the area. At 12:26 a.m., Corporal Hinson arrived at the location described to the dispatcher. Corporal Hinson then called back to the dispatcher on his radio and requested that the dispatcher call the subject back and have him turn on his house lights. The dispatcher advised him that the call had been made from a pay phone. At this point, Corporal Hinson informed the dispatcher that he had passed a subject on the way to the residence whom he thought could have been the person who called the dispatcher.

As defendant and Williams walked toward defendant's residence from the Timesaver, Corporal Hinson approached them in his patrol car. Corporal Hinson pulled alongside Williams and defendant, rolled down the driver's side window of his patrol car, and asked them if they were the ones who had made the break-in call. Williams gave some reply, then immediately shot Corporal Hinson in the face with the .22-caliber pistol three times, killing him. Williams opened the door of the vehicle and pushed Corporal Hinson's body from the driver's seat. Williams then sat in the driver's seat, and defendant sat in the rear passenger seat of the car. Williams drove the vehicle to some dumpsters that were located nearby on Airport Road. On the way to the dumpsters, defendant removed the officer's badge carrier from his right rear pocket. He later threw it into the woods across the road from the dumpsters. Williams removed the officer's pistol from its holster and put it in the front of his pants. Defendant and Williams then opened the trunk of the vehicle and removed four long guns. They hid these guns near a dirt path that ran alongside Airport Road. Defendant and Williams then walked back to defendant's house, where they watched a movie on defendant's VCR. After about an hour and a half, Williams left defendant's house.

By this time, Corporal Hinson's vehicle and body had been discovered by Corporal Billy Hammond of the Columbus County

Sheriff's Department, and the State Bureau of Investigation was called to assist in the investigation of the killing. At 3:30 a.m., SBI Agent Matthew White had ascertained that Corporal Hinson's last responding call was the sixth house on Mill Pond Road. While travelling in this area, Agent White observed a person in the area of the second or third house on Mill Pond Road. Agent White called the individual over to him, but after he did, the individual, who turned out to be Williams, walked away, bending down twice as he did so. Agent White looked around in the area where he saw Williams bend down and observed a .45-caliber pistol and a box of .45-caliber ammunition. Williams was subsequently taken into custody and gave several statements, first denying the offense, then admitting the killing but stating that he had acted alone, and finally indicating that defendant was involved in the shooting.

Defendant was taken into custody later that day. He was advised of his rights, whereupon he waived his rights and gave a statement detailing his involvement in the killing. At trial, defendant testified that although he had called in the fake break-in report and that he was with Williams at the time of the killing, he did not believe that Williams was serious when he said that he intended to kill a policeman.

Other evidence will be presented as necessary for the proper resolution of the issues raised by defendant.

[1] In his first assignment of error, defendant contends that the trial court erred in excluding statements made by Williams, thus depriving defendant of his right to present a defense and of his right to confront witnesses against him.

Subsequent to being taken into custody on 18 June 1991, Williams made five statements to law enforcement officers. In the first of these statements, made to SBI Agents Kennedy and Moser at approximately 4:45 a.m., he denied any involvement in the killing. Later that morning, at around 7:58 a.m., he made another statement, this time to Agent White, in which he admitted shooting Corporal Hinson but indicated that he was alone at the time. At this time, Williams' story was that while walking alone down Mill Pond Road, he happened to find a loaded .22-caliber pistol in a ditch beside the road. He retrieved the pistol and moments later was approached by a patrol car. When the officer saw the pistol in his hand, the officer began to unbuckle his seat belt,

and that was when Williams shot him. He then stated that he threw the gun in a cornfield next to the road.

Around mid-morning following this statement, Agent Kennedy removed Williams from jail and took him to the spot where Williams claimed he threw the pistol into the cornfield. As a search for the pistol was conducted, Williams made a third statement while sitting in Agent Kennedy's patrol car. Again, Williams stated that he was alone at the time of the killing, that he had not called in any fake break-in call, and that he had found the pistol in a ditch. He stated that if there had been anyone else involved, "he would tell it."

Later that afternoon, around 5:20 p.m., Williams was reinterviewed by Agent White. It was during this interview that he made a statement in which he described the events in a manner that was consistent with the statements given by defendant and the evidence presented at trial. Williams now admitted that he and defendant had planned the killing, that they had walked to the Timesaver where defendant made the fake break-in call, and that he and defendant had been together when Williams shot Corporal Hinson.

Finally, Williams was asked at 9:20 p.m. if he would go over the facts concerning the killing again. He agreed and stated that he first began to discuss his plan for killing a police officer while at Vern Bellamy's tavern the night of the killing. He then walked to Tammy Clark's residence where he and defendant discussed the plan further, agreeing to make a fake break-in call from the Timesaver. He again stated that he and defendant were together when Williams shot Corporal Hinson and that they had ridden in the patrol car to the location on Airport Road, taken the weapons from the trunk, hidden them beside the road, and walked to defendant's residence from the location where they had parked the patrol car.

Defendant wished to use Williams' statements that he had acted alone to show that defendant was not an integral part of the plan to kill a police officer. Williams and defendant were to be tried separately, and at the time of defendant's trial, Williams' charges were pending. When defendant called Williams to testify, Williams repeatedly invoked his Fifth Amendment privilege not to give testimony that would implicate himself. Defendant then attempted to have the statements introduced under the Rule 804(b)(3)

exception to the hearsay rule concerning statements against interest. After lengthy hearings concerning the admissibility of Williams' statements, the trial court ruled that Williams was unavailable as a witness, that the statements were against his penal interests when made, and that they were made voluntarily. The trial court refused to allow the introduction of the statements, however, because it ruled that the statements bore insufficient indications of trustworthiness.

The trial court ruled, and the State concedes, that Williams was unavailable to testify within the meaning of N.C.G.S. § 8C-1, Rule 804(a)(1). In order for the hearsay statement of an unavailable witness to be admitted as a statement against interest, however, the statement must also meet the requirements of N.C.G.S. § 8C-1, Rule 804(b)(3), which reads as follows:

> Statement Against Interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. *A statement tending to expose the declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

N.C.G.S. § 8C-1, Rule 804(b)(3) (1992) (emphasis added). The determination of whether the trustworthiness of the statement is indicated by corroborating circumstances is a preliminary matter to be decided by the trial judge. *See* N.C.G.S. § 8C-1, Rule 104 (1992).

In the first statement in which Williams admitted shooting Corporal Hinson, he claimed that he had found the loaded .22-caliber pistol in a ditch only moments before his encounter with Corporal Hinson. This assertion in itself appears highly unlikely given its coincidental nature and the darkened condition of the road at the time. In addition, this account of his acquisition of the pistol conflicts with his own subsequent explanation that he had acquired the pistol from defendant.

Williams further claimed that he threw the pistol into a cornfield after he shot the deputy. Even after Williams accompanied law enforcement officers to this location only a few hours later,

STATE v. BROWN

[335 N.C. 477 (1994)]

no gun was found, even with the aid of tracking dogs. The gun was actually found in defendant's house some time later.

When Williams was questioned again concerning the killing, he continued to insist that he acted alone. He again stated that he had thrown the gun into a cornfield after the killing, even after he was informed that a search had been conducted but no gun had been found. Williams continued to maintain that he was alone. However, as the trial court was aware at the time of the motion hearing, defendant had later confessed his involvement and his fingerprints had been found on the car. These circumstances indicate that the statements made by Williams wherein he insisted that he acted alone when he killed Corporal Hinson were untrue. The trial court's determination that the statements made by Williams were not trustworthy is well supported by the record. Accordingly, defendant was properly precluded from introducing the statements under the Rule 804 statement against interest exception to the prohibition against hearsay. N.C.G.S. § 8C-1, Rule 804(b)(3). Defendant's assignment of error on these grounds is without merit.

[2] Defendant further contends that the failure to admit the statements violated his right of confrontation and his right to due process. We disagree. The right to due process does not include the right to admit untrustworthy declarations.

We are persuaded by the reasoning employed by the United States Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297 (1973). In that case, defendant Chambers was on trial for the murder of a policeman. Another man, McDonald, had given a sworn confession that he was the person who had killed the policeman. Although Chambers was allowed to call McDonald as a witness and to introduce his sworn statement, it was clear that McDonald had previously repudiated the statement. While on the witness stand, McDonald testified to the fact that he had retracted his confession and was allowed to present alibi evidence of his own. In addition, the United States Supreme Court observed:

The trial court refused to allow [Chambers] to introduce the testimony of [three witnesses]. Each would have testified to the statements purportedly made by McDonald, on three separate occasions shortly after the crime, naming [McDonald]

as the murderer. The State Supreme Court approved the exclusion of this evidence on the ground that it was hearsay.

*Chambers*, 410 U.S. at 298, 35 L. Ed. 2d at 310.

Although the United States Supreme Court granted Chambers a new trial, holding that "the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process," *id.* at 302, 35 L. Ed. 2d at 313, the Court took great care to emphasize that "[t]he hearsay statements involved in [that] case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability," *id.* at 300, 35 L. Ed. 2d at 311-12. The Court further stated that "[t]he testimony rejected by the trial court [there] bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest." *Id.* at 302, 35 L. Ed. 2d at 313.

The trial court in the case *sub judice* ruled that the statements at issue did not have any such assurances of trustworthiness; therefore, the rationale underlying the award of a new trial in *Chambers* does not apply. The trial court properly refused to allow the admission of Williams' statements. Defendant was not deprived of his right to due process by the exclusion of the statements, and his assignment of error on this issue is without merit.

[3] Finally, with regard to Williams' statements that no one was with him at the time of the killing, defendant contends that inasmuch as they were not hearsay at all, they should not be barred under either of the prior analyses. Defendant argues that his purpose for admitting the statements was not to prove the truth of the matter asserted, that is, that defendant was not present at the scene of the killing. Instead, defendant argues that Williams' insistence that he was alone is an indication that defendant's participation was incidental or that defendant was not a significant participant in the crime. Defendant contends that this evidence would have been relevant to show that there was no conspiracy between the two and to rebut the theory that defendant and Williams were acting in concert.

Assuming, *arguendo*, that the statements were not hearsay and that they had relevance when presented in this manner, we

note that they are still subject to exclusion if their "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." N.C.G.S. § 8C-1, Rule 403 (1992).

"In general, the exclusion of evidence under the balancing test of Rule 403 of the North Carolina Rules of Evidence is within the trial court's sound discretion," and it is only "where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision" that it will be overturned on appeal. *State v. Hennis*, 323 N.C. at 285, 372 S.E.2d at 527. Defendant himself testified that he was, in fact, present at the time of the killing and that he did participate in the planning of the crime. Thus, if used to show defendant's nonparticipation, the probative value of the statements, if any, was slight. Furthermore, the trial court specifically found the statements to be untrustworthy, clearly viewing them as nothing more than untruths told by defendant's accomplice. The admission of a statement that is so clearly false and that was made by a witness who is unavailable to testify or be cross-examined would have been misleading to the jury. We hold that in the present case, the trial court did not err in refusing to admit these untrustworthy and uncorroborated statements made by defendant's accomplice.

[4] In his next assignment of error, defendant contends that the trial court improperly denied his motion for mistrial based upon the conduct of the victim's daughter in displaying a photograph of the victim during defendant's cross-examination.

The rule governing the declaration of a mistrial is N.C.G.S. § 15A-1061, which states as follows:

Upon motion of a defendant or with his concurrence the judge may declare a mistrial at any time during the trial. The judge must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case.

N.C.G.S. § 15A-1061 (1988). " 'A mistrial should be granted only when there are improprieties in the trial so serious that they substantially and irreparably prejudice the defendant's case and make it impossible for the defendant to receive a fair and impartial ver-

dict.' " *Id.* (quoting *State v. Warren*, 327 N.C. 364, 376, 395 S.E.2d 116, 123 (1990) ).

In the present case, the victim's daughter, Karen McPherson, had in her possession a two-inch by four-inch color photograph of the victim taken while he was in uniform. During defendant's cross-examination, Ms. McPherson was seated in the courtroom two rows behind the district attorney's seat, some six to eight feet from the jury box. At some point, she held the photograph up, facing defendant while he was testifying. She stated on *voir dire* that she did not know what her purpose was in doing so but that she was not attempting to show the picture to the members of the jury. While she was holding the photograph, however, a juror saw it and reported the incident to the bailiff, who in turn informed the trial court. The trial court then conducted a *voir dire* examination of the bailiff and Ms. McPherson. After doing so and after hearing arguments of counsel, the trial court denied defendant's motion for mistrial. Subsequently, the jury was instructed that

> a matter of law has arisen which the Court has resolved by appropriate instructions to all persons who have been in and about the courtroom area during the trial of this matter. You, the jury, are to remain fair and impartial throughout the trial of this case and to base any decision you make in this case solely upon the evidence presented in this courtroom and the law as I will give it to you at the close of all that evidence. You are not to make any decision upon any other bases.

The trial court then recessed for the remainder of the afternoon; the trial did not resume until the following morning. Defendant has not shown nor does the record indicate that Ms. McPherson's conduct resulted in the "irreparable prejudice" necessary to merit the granting of a motion for mistrial. N.C.G.S. § 15A-1061. There is nothing to indicate that any of the jurors were influenced in any way by the photograph or that defendant was prejudiced by Ms. McPherson's conduct. In addition, defendant's argument that the trial court's instructions were inadequate to cure the alleged prejudice is likewise unavailing, as defendant has not shown any prejudice. We hold that the trial court properly denied defendant's motion for mistrial. Defendant's assignment of error on this issue is without merit.

STATE v. BROWN

[335 N.C. 477 (1994)]

[5] In his next assignment of error, defendant contends that the trial court erred in prohibiting the testimony of his expert witness that defendant lacked the mental capacity and ability to conspire. Dr. Thomas Brown was admitted as an expert in the field of forensic psychiatry with a specialty in addictive medicine.

Defendant concedes that this Court has ruled that even qualified expert witnesses may not give opinion testimony concerning legal terms that have specific meanings not readily apparent to the witness or that have definitions that vary from the common definition of the term. *See State v. Daniel*, 333 N.C. 756, 429 S.E.2d 724 (1993); *State v. Jennings*, 333 N.C. 579, 430 S.E.2d 188, *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 602 (1993); *State v. Rose*, 323 N.C. 455, 373 S.E.2d 426 (1988); *State v. Weeks*, 322 N.C. 152, 367 S.E.2d 895 (1988). Defendant contends, however, that the term "conspiracy" is not such a term and insists that "most of the population past the third grade knows what conspiracy means." We disagree.

The specific question objected to was as follows:

Dr. Brown, I want to ask you if you have an opinion as to whether, based upon your examination of [defendant] and your conclusions and the other things you consider, do you have an opinion as to whether or not [defendant] *is the type of person or has the* mental, the *personality* and mental state, to enter into a conspiracy to kill somebody?

(Emphasis added.) An answer to this inartfully phrased question would require Dr. Brown to have not only knowledge of the substantive legal definition of a "conspiracy," but also knowledge of the legal elements necessary for entrance into a conspiracy. Finally, testimony by Dr. Brown concerning the "type of person" or "personality" necessary to enter into a conspiracy would be fraught with substantial risk of confusing or misleading the jury. No attempt was made to rephrase or clarify the question. We hold that the trial court correctly sustained the State's objection to this question. This assignment of error is overruled.

[6] In his next assignment of error, defendant contends that the trial court erred in failing to give certain jury instructions requested by him. Specifically, defendant contends that the trial court should have instructed the jury (1) that a conspiracy requires a union of wills and the intent to effectuate the object of the con-

spiracy; and (2) that in order to aid and abet Williams, defendant must have known that Williams intended to rob and murder Corporal Hinson.

With regard to a defendant's request for jury instructions, this Court has consistently held that a trial court is not required to repeat verbatim a requested, specific instruction that is correct and supported by the evidence, but that it is sufficient if the court gives the instruction in substantial conformity with the request. *State v. Rhinehart*, 324 N.C. 310, 315, 377 S.E.2d 746, 749 (1989); *State v. Davis*, 291 N.C. 1, 14, 229 S.E.2d 285, 294 (1976); *State v. Bailey*, 254 N.C. 380, 386, 119 S.E.2d 165, 170 (1961).

With regard to the charge of conspiracy to commit murder, the trial court instructed the jury as follows:

I charge . . . that for you, the jury, to find the defendant, Michael Thomas Brown, guilty of conspiracy to commit murder, the state must prove three things, each beyond a reasonable doubt. First, that the defendant, Michael Thomas Brown, and Aquino Lee Williams entered into an agreement. Second, that the agreement was to commit murder.

Murder, ladies and gentlemen, is the unlawful killing of another human being with malice. Third, that the defendant, Michael Thomas Brown, and Aquino Lee Williams intended that the agreement be carried out at the time the agreement was made.

Similar instructions were given for the charge of feloniously conspiring to commit robbery with a firearm.

By instructing the jury that defendant and Williams must have entered into an agreement to commit murder and that at the time the agreement was made, they intended that it be carried out, the trial court charged in substantial conformity with the requested instruction regarding the requirement of a union of wills. The trial court also clearly complied with defendant's request that the jury be instructed that it must find that defendant and Williams intended to effectuate the object of the conspiracy.

With regard to the charge of first-degree murder on the basis of aiding and abetting, the trial court instructed the jury as follows:

For you to find the defendant, Michael Thomas Brown, guilty of first degree murder on the basis of malice, premedita-

STATE v. BROWN

[335 N.C. 477 (1994)]

tion and deliberation because of aiding and abetting, the state must prove four things, each beyond a reasonable doubt. First, that first degree murder on the basis of malice, premeditation and deliberation was committed by Aquino Lee Williams.

. . . .

Second, the defendant, Michael Thomas Brown, knowingly advised, instigated, encouraged or procured or aided Aquino Lee Williams to commit first degree murder. Again, ladies and gentlemen, the defendant is not guilty of first degree murder merely because he is present at the scene, even though he may silently approve of the crime or secretly intends to assist in its commission.

To be guilty, the defendant, Michael Thomas Brown, must aid or actively encourage Aquino Lee Williams in committing the crime or, in some way, communicate to Aquino Lee Williams's [sic] the defendant's intention to assist in the commission of the crime. Third, that the defendant, Michael Thomas Brown, himself, acted after premeditation, as I have previously defined that term, with deliberation, as I have previously defined that term, and willfully, that is, intentionally and purposefully.

. . . .

. . . Fourth, that the defendant, Michael Thomas Brown's actions or statements caused or contributed to the commission of the first degree murder of Robert Howard Hinson by Aquino Lee Williams.

Similar instructions were given for the charges of felony murder and murder by lying in wait.

In instructing the jury that defendant was required to "aid or actively encourage Aquino Lee Williams in committing the crime or, in some way, communicate to Aquino Lee Williams's [sic] the defendant's intention to assist in the commission of the crime," the jury was required to determine that defendant knew that Williams intended to rob and murder Corporal Hinson. The trial court gave jury instructions that incorporated those features requested by defendant, and his assignment of error on these grounds is therefore without merit.

**[7]** In his next assignment of error, defendant contends that the trial court erred when it refused to give the requested instruction on voluntary intoxication as a defense to those charges requiring intent.

"[I]n order for an instruction on voluntary intoxication to be required the evidence must be that defendant's intoxication rendered him 'utterly incapable' of forming a deliberate and premeditated intent to kill." *State v. Mash*, 323 N.C. 339, 348, 372 S.E.2d 532, 537 (1988) (quoting *State v. Strickland*, 321 N.C. 31, 41, 361 S.E.2d 882, 888 (1987)). Mere intoxication is not sufficient to meet this burden. *State v. Reeb*, 331 N.C. 159, 174, 415 S.E.2d 362, 370 (1992).

In the present case, defendant offered evidence that showed that he had consumed approximately ten or eleven beers beginning about 7:30 p.m. the evening of the murder. His expert witness testified that he had learned that defendant had been engaged in a pattern of drinking eight to twelve beers a day, which could have caused an "accumulative impairment of mental functions." In addition, defendant's expert testified that defendant would have been acutely intoxicated at the time of the murder and that his capacity to plan and have good judgment would have been adversely affected.

Taken in the light most favorable to defendant, the evidence tends to show that defendant was intoxicated at the time of the killing. Again, however, evidence of intoxication is not sufficient to mandate an instruction on the defense of voluntary intoxication. *See State v. Yelverton*, 334 N.C. 532, 434 S.E.2d 183 (1993); *see also State v. Medley*, 295 N.C. 75, 243 S.E.2d 374 (1978). Rather, "[t]he evidence must show that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill." *Medley*, 295 N.C. at 79, 243 S.E.2d at 377. The evidence in the present case suggests that defendant was intoxicated to some degree, but nothing in the record, taken in the light most favorable to defendant, suggests that his degree of intoxication approached the level necessary to support an instruction on the defense of voluntary intoxication. Defendant's assignment of error on these grounds is overruled.

**[8]** In his last assignment of error, defendant contends that the trial court erred in allowing the State to impeach defendant's expert witness concerning the witness' fee. Defendant appears to

agree that this Court has consistently held that "an expert witness' compensation is a permissible cross-examination subject to test partiality towards the party by whom the expert was called." *State v. Allen*, 322 N.C. 176, 195, 367 S.E.2d 626, 636 (1988); *see also State v. Creech*, 229 N.C. 662, 51 S.E.2d 48 (1949). Defendant argues that in the present case, the cross-examination was improper because the expert witness had been provided to defendant by order of the trial court and was being paid for with state funds. We disagree.

"[W]here evidence of bias is elicited on cross-examination the witness is entitled to explain, if he can, on redirect examination, the circumstances giving rise to bias so that the witness may stand in a fair and just light before the jury." *State v. Patterson*, 284 N.C. 190, 196, 200 S.E.2d 16, 20 (1973); *see also State v. Hicks*, 233 N.C. 511, 64 S.E.2d 871, *cert. denied*, 342 U.S. 831, 96 L. Ed. 629 (1951).

If defendant believed at trial that the circumstances surrounding the retention and payment of the expert witness were such that the jury would have inferred no bias on his part, he was free to demonstrate this through redirect examination. Defendant's final assignment of error is without merit.

We conclude that defendant received a fair trial free from prejudicial error and that the judgment appealed from must be upheld.

NO ERROR.