STATE OF NORTH CAROLINA v. LARRY PATRICK BURGESS, JR.

No. 294A96

(Filed 10 February 1997)

1. **Criminal Law § 914 (NCI4th Rev.)— first-degree murder— instructions—premeditation and deliberation and felony murder—no denial of unanimous verdict**

The trial court did not violate defendant's constitutional right to a unanimous jury verdict in its instructions informing the jury that it could convict defendant of first-degree murder under

either or both theories of premeditated and deliberate murder and felony murder, and the instructions did not constitute plain error, where the instructions made it clear to the jury that it had to be unanimous on both the verdict and the basis for that verdict; the instructions could not have been interpreted by the jury to permit different jurors to convict defendant on the basis of different theories; and the verdict sheet and the jury poll show that the jury did not construe the instructions to allow it to convict defendant of first-degree murder on a basis that was not unanimously found beyond a reasonable doubt in that the jury found defendant guilty of both premeditated and deliberate murder and felony murder and each juror indicated that he or she found defendant guilty of first-degree murder based on both theories.

**Am Jur 2d, Criminal Law § 1014.**

2. **Homicide § 727 (NCI4th)— first-degree murders—premeditation and deliberation and felony murder—sentence for underlying felony**

Where defendant was convicted of two first-degree murders based upon theories of premeditation and deliberation and felony murder, the underlying felony of arson did not merge with the murders, and the trial court did not err by sentencing defendant separately for each of the murders and for the underlying felony of arson.

**Am Jur 2d, Homicide §§ 44-48, 52, 184, 439, 501.**

**Modern status of the rules requiring malice "afore-thought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.**

3. **Homicide § 727 (NCI4th)— two first-degree murders—premeditation and deliberation and felony murder—each murder as underlying felony—sentences for both murders**

Where defendant was convicted of two first-degree murders based upon theories of premeditation and deliberation and felony murder, there was no merger of either murder conviction by its use as an underlying felony for the other murder, and the trial court did not err by sentencing defendant separately for each murder.

**Am Jur 2d, Homicide §§ 44-48, 52, 184, 439, 501.**

Modern status of the rules requiring malice "afore-thought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.

4. **Criminal Law § 1156 (NCI4th Rev.)— arson—nonstatutory aggravating factor—course of conduct endangering others—contemporaneous murder convictions not used**

The trial court did not improperly use defendant's contemporaneous murder convictions as a nonstatutory aggravating factor for an arson conviction when it found that "the arson was committed during a course of conduct in which other crimes endangered the lives of others" where the "other crimes" involved assaults on one murder victim's children rather than the murders. Furthermore, this "course of conduct" clearly related to the purposes of sentencing and was properly found as a nonstatutory aggravating factor.

Am Jur 2d, Arson § 31.

5. **Criminal Law § 1218 (NCI4th Rev.)— arson—aggravating factor—armed with deadly weapon—not basis for joinable crimes**

The trial court could properly find as an aggravating factor for an arson conviction that "defendant was armed with a deadly weapon at the time of the crime" where defendant was convicted of two counts of first-degree murder and one count of first-degree arson, and the act of carrying the deadly weapon could have been, but was not, the basis for other joinable criminal convictions.

Am Jur 2d, Criminal Law §§ 598, 599.

6. **Criminal Law § 697 (NCI4th Rev.)— requested instruction given in substance—no error**

The trial court did not err by refusing to give the jury in a first-degree murder prosecution defendant's requested instruction on lack of mental capacity where the court instructed the jury in substantial conformity with the specific instruction requested by defendant.

Am Jur 2d, Trial §§ 1259, 1260.

7. **Homicide § 33 (NCI4th)— first-degree murder—premedi-tation and deliberation—cool state of blood—sufficiency of evidence**

The State's evidence was sufficient to support a finding by the jury that defendant killed the victims in a cool state of blood so as to support his conviction of two first-degree murders based upon the theory of premeditation and deliberation, notwithstanding defendant may have been angry or in an emotional state at the time he shot the victims, where the evidence tended to show that defendant entered one victim's apartment without a pistol, argued with this victim, left the apartment, and then returned to the apartment with a pistol; after again arguing with such victim, defendant shot his way into a bathroom where the two victims and three small children had locked themselves away from defendant's reach; once inside the bathroom, defendant, a Marine experienced with firearms, took aim and fired a bullet into the first victim's neck; and defendant then placed the muzzle of the gun next to the hand the second victim had raised to defend herself and shot her in the head.

**Am Jur 2d, Homicide §§ 60, 115, 292.**

8. **Evidence and Witnesses § 2302 (NCI4th)— first-degree murders—expert testimony that defendant "snapped"—exclusion as harmless error**

The trial court erred in excluding testimony by a forensic psychologist that defendant had "snapped" at the time of two murders because this testimony tended to show that defendant was not in a cool state of blood when he shot the victims and was thus relevant to show that defendant did not premeditate and deliberate the killings. However, this error was not prejudicial where the witness was allowed to give testimony about defendant's mental state at the time of the murders which indicated that defendant did not form the specific intent to kill, and the jury's verdicts would not have been different if the witness had given his opinion that defendant "snapped."

**Am Jur 2d, Expert and Opinion Evidence §§ 193, 194, 362, 363.**

**Admissibility of expert testimony as to whether accused had specific intent necessary for conviction. 16 ALR4th 666.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing two sentences of life imprisonment entered by Ragan, J., at the 23 October 1995 Criminal Session of Superior Court, Pitt County, upon jury verdicts of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment imposed for first-degree arson was allowed 9 July 1996. Heard in the Supreme Court 12 November 1996.

*Michael F. Easley, Attorney General, by R. Kendrick Cleveland, Associate Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Charlesena Walker, Assistant Appellate Defender, for defendant-appellant.*

FRYE, Justice.

Upon proper indictments, defendant was tried and convicted of murder in the first degree of Juanita Michelle Jones (Jones), murder in the first degree of Christie Nicole Smith (Smith), and first-degree arson of the home of Juanita Michelle Jones and her three small children. As to each murder victim, the jury found defendant guilty of murder in the first degree on the basis of malice, premeditation, and deliberation as well as under the felony murder rule. At the capital sentencing proceeding, the jury recommended a sentence of life imprisonment for each murder. On 17 November 1995, Judge Ragan entered judgments imposing sentences of life imprisonment for each of the first-degree murder convictions and life imprisonment for the first-degree arson conviction.

On appeal to this Court, defendant makes eight arguments. After reviewing the record, transcript, and briefs in this case, we conclude that defendant received a fair trial, free of prejudicial error.

The State's evidence presented at trial tended to show the following facts and circumstances: On 20 May 1994, defendant borrowed a friend's automobile and drove to the apartment of Juanita Michelle Jones, whom he had dated in the past. Brittany Jones, Jones' four-year-old daughter, let defendant into the house. After arguing with Jones, defendant returned to the automobile, obtained a .38-caliber pistol from under the seat of the automobile, and reentered the apartment. Defendant displayed the pistol and told Brittany to go upstairs. Brittany went upstairs and told Jones, who was ironing at the time, that defendant had a gun. Defendant refused to allow Jones to leave the room. Brittany ran to the bathroom where her younger

brothers and Christie Nicole Smith, Jones' cousin, were. Jones ran into the bathroom and locked the door. Defendant burst through the door and killed Jones and Smith. He choked Brittany and her two brothers and threw them to the floor. Defendant set a fire in Jones' closet and then left the apartment.

Mary Cox, Jones' aunt, telephoned Jones' apartment on 20 May 1994. Brittany answered the telephone and said, "Aunt Helen, come. [Defendant] killed my momma and Chris. Come. We are going to burn up." Cox immediately left work and went to Jones' apartment. When Cox arrived, she noticed black smoke coming out the back door. Cox opened the door and was met by Jones' children. As the children grabbed her and ran from the apartment, Cox noticed blood "everywhere" on their clothes.

Defendant testified at trial that he was twenty-one years old in May 1994 and that he had been in the United States Marine Corps for about one year. Defendant further testified that he met Jones in January 1992 in a Jacksonville shopping mall and that Jones had lied to him about not having children, about being in school, about having a job, and about not having dated a serviceman before. They continued to date for a while, even after he discovered these untruths. In the summer of 1992, Jones told defendant that she was marrying a corporal and that she would be moving with him to California. Defendant testified that he was happy for her.

Defendant further testified that in January 1993, Jones tried twice to reach defendant at his office, but defendant was meeting with a superior officer each time she called and could not come to the telephone. During one call, someone grabbed the telephone from Jones and told the sergeant who answered the telephone that if defendant was too busy to talk to Jones, he could talk to her in court. Jones did not leave her name either time she called, and defendant was dumbfounded by the message. In February 1993, defendant learned that a civil summons had been issued to him for nonsupport. It was defendant's first knowledge of the lawsuit. At court, Jones admitted that she was not sure whether her third child was defendant's but that she had to bring the suit because her mother was "on her case about having kids and having deadbeat dads for them." Shortly thereafter, Jones told the district attorney that she wanted to drop the suit.

Defendant further testified that Jones stopped by his barracks at Camp Lejeune in Jacksonville between 5:30 and 6:00 one morning in June 1993 and stated that she was at the camp visiting a friend and

just wanted to see how he was doing. He told her that he had a busy morning ahead of him and needed to get some rest. Shortly thereafter, there was another knock at the door of defendant's barracks, and defendant found a baby at the door and saw Jones driving away. Defendant drove around, found Jones at her friend's house in Greenville, and returned the baby. Jones had told defendant that if he did not have time for her, he would have to make time. Defendant returned to the barracks too late for a class required to maintain his security clearance. As a result of being late for class, defendant was dismissed from the class, and his top-secret security clearance was nullified.

Defendant testified that in August 1993, he was deployed overseas to Bosnia and Somalia. While he was away, Jones called Camp Lejeune looking for him and "fussed out" several high-ranking officers. Upon returning to Camp Lejeune, defendant was informed of these calls and was advised to get blood tests performed to determine paternity. Pursuant to this advice, defendant and Jones scheduled blood testing at the Department of Social Services (DSS) in Greenville. Defendant missed the first appointment and his rescheduled appointment because he was performing field operations. Defendant called DSS to report that he would not be able to make the appointments. The DSS worker who answered the telephone told defendant that if he could not make his appointment, they would see him in court. The court date was set for 13 May 1994. At court, the judge declined making a decision on the nonsupport action and ordered defendant to appear for blood testing on 20 May 1994.

Defendant also testified that on 20 May 1994, he borrowed a friend's automobile and went to Jones' apartment to drive her to the health department for the blood testing. Jones, however, just wanted him to sign papers acknowledging that he was the father. He asked her why she had not told him during her pregnancy that she was pregnant and suspected that he was the father. Defendant also asked Jones about the sergeant she was purportedly dating during her pregnancy. An argument ensued, and Jones grabbed a knife from the kitchen and asked defendant to leave. Defendant went out to the automobile to leave but changed his mind because he did not want to be degraded at the health department without first getting some answers from Jones. At that point, defendant reached under the seat and grabbed a .38-caliber pistol that he knew the owner of the automobile kept under the seat.

Defendant testified that he then reentered Jones' apartment and proceeded upstairs where Jones and Smith were talking. When Jones saw that defendant had a gun, she asked if that was supposed to mean anything. After defendant told her that he just wanted to talk, Jones stated that she did not need him for anything and that defendant had better pray that the child was not his because she was going to make the rest of his life miserable. Jones threatened to "put a curse" on defendant. The argument escalated, and defendant fired the pistol. Defendant testified that he did not remember how many times he fired the weapon but that he did remember shooting the victims. Defendant then testified that he was "really nervous" and that he set fire to his clothes in Jones' closet because he thought that Jones had used them to put a curse on him. Defendant denied that he tried to harm the children.

Defendant's motions to dismiss made at the close of the State's evidence and again at the close of all the evidence were denied.

[1] In his first argument, defendant contends that the trial court committed plain error in instructing the jury about premeditated and deliberate murder and felony murder and by informing the jury that it could convict defendant of first-degree murder under either or both theories. Defendant argues that the trial court should have specifically informed the jury that it had to be unanimous on the theory of first-degree murder upon which its verdict was rendered. Defendant contends that the jury could have interpreted the instructions to allow a conviction on a theory of first-degree murder not found by all the jurors beyond a reasonable doubt, in violation of his constitutional right to a unanimous jury. Defendant contends that it is impossible to determine whether the jury unanimously found that he actually committed either premeditated and deliberate murder or felony murder or if different jurors convicted him on the basis of different theories. Notwithstanding the failure to object to the instructions at trial, defendant argues that this Court should grant a new trial under the plain error rule because of a perceived lack of evidence that defendant formed the intent to kill while in a cool state of blood. In light of the actual instructions given to the jury, the verdict sheet returned by the jury, and the jury poll, we are satisfied that the jury was not misled by the instructions.

We rejected a similar challenge in *State v. Alford*, 339 N.C. 562, 453 S.E.2d 512 (1995). In *Alford*, we noted:

The actual instructions given by the trial court made it clear to the jury that it had to be unanimous on both the verdict and the basis for that verdict. After informing the jury that it could "find the defendant guilty of first degree murder on either or both of two theories[,] [t]hat is, on the basis of malice, premeditation and deliberation, or under the felony—first-degree felony murder rule," the trial court charged the jury on first-degree murder by premeditation and deliberation and then instructed on the elements of felony murder.

*Id.* at 575, 453 S.E.2d at 519.

As in *Alford,* the actual instructions given by the trial court in the instant case made it clear to the jury that it had to be unanimous on both the verdict and the basis for that verdict. After informing the jury that it could find "defendant guilty of first degree murder on either or both of two theories, that is, on the basis of malice, premeditation and deliberation, or under the first-degree felony murder rule," the trial court charged the jury on first-degree murder on the basis of malice, premeditation, and deliberation and then instructed on the elements of first-degree murder under the felony murder rule. The court in the instant case then charged the jury as follows:

So I charge that if you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant intentionally killed the victim with a deadly weapon and that this proximately caused the victim's death, and that the defendant intended to kill the victim, and that he acted with malice after premeditation and with deliberation, it would be your duty to return a verdict of guilty of first-degree murder on the basis of malice, premeditation, and deliberation.

However, if you do not so find or have a reasonable doubt as to one or more of these things, you would not run [sic] a verdict of guilty of first-degree murder on the basis of malice, premeditation, and deliberation.

Whether or not you find the defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation, you will also consider whether he is guilty of first-degree murder under the first-degree felony murder rule.

We note that this instruction is essentially identical to the instruction given in *Alford.*

In *Alford*, we noted that "[t]he court then gave the final mandate on felony murder and finally instructed the jurors, 'You and each of you, that is, all 12 of you, must unanimously agree upon any verdict which you return.' " *Id.* at 576, 453 S.E.2d at 519. In the instant case, after instructing the jurors on felony murder, the court continued to instruct the jury on other crimes for which defendant could be found guilty. The court then told the jury: "Now, I instruct you that a verdict is not a verdict until all twelve jurors agree unanimously as to what your decision shall be. You may not render a verdict by majority vote." After admonishing the jurors as to their "duty to consult with one another and to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment," the court instructed the jurors, "Now, when you have reached a unanimous verdict you will have your foreperson mark your—mark the ballot (sic) appropriately and knock on the door to announce your verdict."

We further note that in *Alford*, we said:

[T]he verdict sheet actually returned by the jury and the jury poll conducted after the verdict was returned indicate that the jurors did not construe the disjunctive instructions to allow the jury to convict defendant of first-degree murder on a basis that was not unanimously found beyond a reasonable doubt. The verdict sheet clearly indicates that the jury found defendant guilty of both premeditated and deliberate murder and felony murder. When polled, each juror reiterated that he or she found defendant guilty of first-degree murder based on both theories.

*Id.* at 575, 453 S.E.2d at 519. In the instant case, the verdict sheet actually returned by the jury and the jury poll conducted after the verdict was returned indicate that the jurors did not construe the court's instructions in a manner allowing the jury to convict defendant of first-degree murder on a basis that was not unanimously found beyond a reasonable doubt. The verdict sheet indicates that the jury found defendant guilty of both premeditated and deliberate murder and felony murder. Further, the record shows that when polled, no juror expressed that he or she had not found defendant guilty of first-degree murder based on both theories. Accordingly, as in *Alford*, we conclude that defendant's contentions are without merit, and we reject defendant's first argument.

[2] In his second argument, defendant contends that the trial court committed reversible error when it imposed judgment upon defendant for the arson conviction when defendant had already been con-

victed and sentenced for his convictions of first-degree murder based upon the felony murder rule with arson as one of the underlying felonies. Defendant argues that because arson was used as one of the underlying felonies to support his first-degree murder convictions under the felony murder rule, defendant could not be sentenced for both arson and murder.

In *State v. Lewis*, 321 N.C. 42, 361 S.E.2d 728 (1987), we said:

> When the evidence so warrants, a trial judge may submit a special verdict form to the jury that allows the jurors to indicate whether they find the defendant guilty of first degree murder based upon premeditation and deliberation or first degree murder based on a felony murder theory. *State v. Silhan*, 302 N.C. 223, 275 S.E.2d 450 (1981). However, if both theories are submitted to the jury and the jury finds the defendant guilty under both theories the underlying felony need not merge with the murder. *State v. Rook*, 304 N.C. 201, 283 S.E.2d 732 (1981)[, *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982)].

*Lewis*, 321 N.C. at 50, 361 S.E.2d at 733. In the instant case, defendant was convicted of the first-degree murders based upon theories of premeditation and deliberation and felony murder. Thus, the underlying felony of arson need not merge with the murder convictions, and it was not error to sentence defendant separately for each of the murders and for the underlying felony.

[3] In his third argument, defendant contends that the trial court erred when it imposed separate judgments for each of the two first-degree murder convictions since the convictions were based upon the felony murder rule and each homicide was used as the underlying felony for the other. Again we note that defendant was convicted of the first-degree murders based on theories of premeditation and deliberation and felony murder. Defendant was sentenced only once for the murder of Jones and once for the murder of Smith. Since there was no merger of either murder conviction by its use as an underlying felony for the other murder, *see id.*, the trial court did not err by sentencing defendant separately for each murder.

[4] In his fourth argument, defendant contends that the trial court improperly used his contemporaneous murder convictions as a non-statutory aggravating factor for the arson conviction when it found that "the arson was committed during a course of conduct in which other crimes endangered the lives of others." We disagree.

## STATE v. BURGESS

[345 N.C. 372 (1997)]

In *State v. Taylor*, 322 N.C. 280, 367 S.E.2d 664 (1988), we said:

Pursuant to the Fair Sentencing Act, the trial court is not confined to consideration of statutory factors only, but may consider nonstatutory factors to the extent they are (1) related to the purposes of sentencing and (2) supported by the evidence in the case. N.C.G.S. § 15A-1340.4(a) (1983). Amongst the purposes of sentencing explicitly identified in N.C.G.S. § 15A-1340.3 are "to protect the public by restraining offenders" and "to provide a general deterrent to criminal behavior."

*Taylor*, 322 N.C. at 287, 367 S.E.2d at 668. Additionally, the Fair Sentencing Act[1] and our cases interpreting it establish that a conviction may not be aggravated by (1) prior convictions of other crimes which could have been joined for trial, (2) contemporaneous convictions of crimes actually joined, or (3) acts which form the gravamen of these prior or contemporaneous convictions. N.C.G.S. § 15A-1340.4(a)(1)o (1983); *State v. Hayes*, 323 N.C. 306, 372 S.E.2d 704 (1988); *State v. Westmoreland*, 314 N.C. 442, 334 S.E.2d 223 (1985); *State v. Lattimore*, 310 N.C. 295, 311 S.E.2d 876 (1984).

In the case before us, the trial court aggravated defendant's sentence on the basis of defendant's committing the arson "during a course of conduct in which other crimes endangered the lives of others." Contrary to defendant's contention that the "other crimes" referred to in this nonstatutory aggravating factor include the murders of Jones and Smith for which defendant was contemporaneously convicted, we conclude that the other crimes involved the assaults on Jones' three small children. It is certainly reasonable to conclude that this is the type of behavior from which the public should be protected and from which possible future offenders should be deterred. Thus, the trial court's finding of the nonstatutory aggravating factor in question was clearly related to the purposes of sentencing.

Moreover, the trial court's finding was amply supported by the evidence. The State's evidence in the proceeding below indicated that when defendant pulled his gun, he saw Brittany run into the bathroom where Smith and the other two children were. The shell casings found in the bedroom show that defendant fired two bullets into the locked bathroom while he was standing on the outside of the door in the master bedroom. Further, the State's evidence shows that defend-

---

1. The Fair Sentencing Act, N.C.G.S. § 15A-1340.1 to -1340.7 (1988), was repealed effective 1 October 1994, when the Structured Sentencing Act became effective for offenses occurring on or after that date.

ant choked the three children and threw them to the floor. This evidence is sufficient for the trial judge to find the aggravating factor that the arson was committed during a course of conduct, that is, the assaults on the children, that endangered the lives of others. These crimes are separate and distinct from the murders for which defendant was convicted. Thus, the aggravating factor did not run afoul of the statute.

[5] In his fifth argument, defendant contends that the trial court improperly used evidence of the offenses joined for trial when it found as an aggravating factor for the arson conviction that "defendant was armed with a deadly weapon at the time of the crime." In the instant case, defendant was convicted of two counts of first-degree murder and one count of first-degree arson. The trial court found as an aggravating factor that defendant was armed with a deadly weapon at the time he started the fire that constituted the criminal act supporting the arson conviction. We have held that acts which could have been, but were not, the basis for other joinable criminal convictions may be used to aggravate the conviction for which a defendant is being sentenced. *State v. Abee*, 308 N.C. 379, 302 S.E.2d 230 (1983). Because the act of carrying the deadly weapon could have been, but was not, the basis for other joinable criminal convictions, it may be used to aggravate the conviction for which defendant is being sentenced. Accordingly, we find no error in the trial court's use of this aggravating factor.

[6] In his sixth argument, defendant contends that the trial court committed reversible error when it refused to instruct the jury on the lack of mental capacity according to defendant's requested written instruction. Defendant requested the following instruction:

You may find that there is evidence which tends to show that the defendant lacked mental capacity at the time of the alleged events in this case. However, if you find that the defendant lacked mental capacity, you should consider whether this condition affected whether or not he deliberated prior to his killing which is required for the conviction of first-degree murder. In order for you to find the defendant guilty of first-degree murder, you must find beyond a reasonable doubt that he killed the deceased with malice, and in the execution of an actual specific intent to kill formed after premeditation and deliberation.

If as a result of lack of mental capacity, the defendant did not deliberate prior to killing the deceased, he is not guilty of first-

degree murder. Therefore, I charge that if upon considering the evidence with respect to the defendant's lack of mental capacity you have a reasonable doubt as to whether the defendant formulated the specific intent required for the conviction of first-degree murder, you will not return a verdict of guilty of first-degree murder.

The State offered North Carolina criminal pattern jury instruction 305.11. After considering both parties' proposed jury instructions, the trial court consolidated the two instructions and instructed the jury as follows:

Now, you may find that there is evidence which tends to show that the defendant lacked mental capacity at the time of the acts alleged in this case. If you find that the defendant lacked mental capacity, you could—you should consider whether this condition affected his ability to formulate the specific intent which is required for conviction of first-degree murder on the basis of malice, premeditation, and deliberation, or whether this condition affected his ability to premeditate or deliberate.

In order for you to find the defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation, you must find beyond a reasonable doubt that he killed the deceased with malice and [in] the execution of an actual specific intent to kill formed after premeditation [] and deliberation.

If as a result of a lack of mental capacity, the defendant did not have the specific intent to kill the deceased formed after premeditation [] and deliberation, he is not guilty of first-degree murder on the basis of malice, premeditation, and deliberation.

If as a result of a lack of mental capacity, the defendant did not have the ability to premeditate or deliberate, he is not guilty of first-degree murder on the basis of malice, premeditation, and deliberation.

Therefore, I charge that if—upon considering the evidence with respect to the defendant's lack of mental capacity you have a reasonable doubt as to whether the defendant formulated the specific intent required for the conviction of first-degree murder or lacked the mental capacity to premeditate or deliberate, you will not return a verdict of guilty of first-degree murder on the basis of malice, premeditation, and deliberation.

In *State v. Brown*, 335 N.C. 477, 439 S.E.2d 589 (1994), we said:

> With regard to a defendant's request for jury instructions, this Court has consistently held that a trial court is not required to repeat verbatim a requested, specific instruction that is correct and supported by the evidence, but that it is sufficient if the court gives the instruction in substantial conformity with the request.

*Id.* at 490, 439 S.E.2d at 597. In the instant case, the trial court instructed the jury in substantial conformity with the specific instruction requested by defendant. Therefore, we reject defendant's sixth argument.

**[7]** In his seventh argument, defendant contends that the trial court committed reversible error in denying his motion to dismiss the charges of first-degree murder based upon the theory of premeditation and deliberation. Defendant argues that the State's evidence failed to prove beyond a reasonable doubt that defendant formed the intent to kill the victims while in a cool state of blood.

In ruling on a motion to dismiss, the trial court must examine the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference that can be drawn therefrom. *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980). "The defendant's evidence, unless favorable to the State, is not to be taken into consideration." *State v. Jones*, 280 N.C. 60, 66, 184 S.E.2d 862, 866 (1971). The determination of the witnesses' credibility is for the jury. *See State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988).

In *State v. Saunders*, 317 N.C. 308, 345 S.E.2d 212 (1986), we said:

> "Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation." *State v. Calloway*, 305 N.C. 747, 751, 291 S.E.2d 622, 625 (1982). Premeditation is defined as "thought beforehand for some length of time no matter how short." *Id.* Deliberation means an "intention to kill executed by the defendant in a 'cool state of blood' in furtherance of a 'fixed design to gratify a feeling of revenge, or, to accomplish some unlawful purpose.'" *Id.* "'Cool state of blood' as used in connection with premeditation and deliberation does not mean absence of passion and emotion but means that an unlawful killing is deliberate and premeditated if executed with a

fixed design to kill notwithstanding defendant was angry or in an emotional state at the time." *State v. Ruof*, 296 N.C. 623, 636, 252 S.E.2d 720, 728 (1979).

*Saunders*, 317 N.C. at 312, 345 S.E.2d at 215.

In the instant case, there was substantial evidence to support a finding that defendant killed the victims in a cool state of blood. Viewing the evidence in the light most favorable to the State, as we must, the evidence shows that defendant entered Jones' apartment without a pistol and, after leaving the apartment after an argument with Jones, returned with a pistol, argued with Jones again, and then shot his way into the bathroom where Jones, Smith, and the three small children had locked themselves away from defendant's reach. Once inside the bathroom, defendant, a Marine experienced with firearms, took aim and fired a bullet into Jones' neck and placed the muzzle of the gun next to the hand Smith had raised to defend herself and shot her in the head. Notwithstanding that defendant may have been angry or in an emotional state at the time he shot the victims, the evidence was sufficient for a jury to find that defendant executed his specific intent to kill in a cool state of blood. Therefore, the trial court did not err in denying defendant's motion to dismiss for insufficiency of the evidence.

[8] In his eighth and final argument, defendant contends that the trial court committed reversible error by sustaining the prosecutor's objections to a portion of the direct testimony of Dr. John Warren, a forensic psychologist, relating to defendant's state of mind at the time of the killings.

On direct examination, defense counsel asked Dr. Warren whether he had an opinion concerning whether the killings of the victims in this case were "committed in a cool state of blood." After he stated that he had an opinion, defense counsel asked Dr. Warren to state his opinion, at which time the State objected. Outside the presence of the jury, the trial court sustained the State's objection as to the use of a precise legal term. Defense counsel then offered to rephrase the question. On *voir dire*, defense counsel rephrased the question concerning defendant's mental state to ask whether "around the time of the killings of [the victims,] . . . [defendant] had snapped." The trial court sustained the State's objection to the use of the term "snapped." On *voir dire*, Dr. Warren stated that he had an opinion as to whether defendant had "snapped" and testified as follows:

Recognizing the imprecise nature of the term—slang term snapped, as I said in my report, I believe that the defendant had an inability to think things through calmly and clearly, to weigh options or consider alternatives at the moment of the shootings. And this combined with his report of snapping, would indicate that yes, he snapped.

Defendant argues that the testimony of Dr. Warren that defendant "snapped" tended to show that defendant was not in a cool state of blood when he shot the victims and, thus, was relevant since it tended to show that defendant did not premeditate and deliberate the killings. We agree. *See State v. Shank,* 322 N.C. 243, 367 S.E.2d 639 (1988) (expert witness may testify concerning defendant's ability to make and carry out plans, and jury may consider such evidence when determining if defendant had the ability to form a specific intent).

Nevertheless, a determination of relevancy under Rule 401 does not necessarily end the inquiry as to whether a trial court erred in sustaining an objection to proffered expert witness testimony. As we said in *State v. Jackson,* 340 N.C. 301, 457 S.E.2d 862 (1995):

The admissibility of evidence is first governed by Rule 401 of the Rules of Evidence, which defines relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Rule 702 sets the standard for the admissibility of expert opinion testimony, specifying that a witness qualified as an expert may testify as to scientific, technical or other specialized knowledge *if* such testimony "will assist the trier of fact to understand the evidence *or to determine a fact in* issue." N.C.G.S. § 8C-1, Rule 702 (1992).

*Jackson,* 340 N.C. at 310, 457 S.E.2d at 868.

As an expert witness in the field of psychology, Dr. Warren was, by education and training, in a better position than the jury to evaluate whether defendant could formulate a specific plan or intent to kill. *See State v. Wilkerson,* 295 N.C. 559, 247 S.E.2d 905 (1978). An expert witness' opinion to the effect that the defendant's capacity to calmly function and plan was severely impaired is evidence which arguably would tend to show that the defendant acted without premeditation and deliberation and could not form the specific intent to kill.

Assuming *arguendo* that Dr. Warren's opinion that defendant "snapped" could have "assist[ed] the trier of fact to understand the evidence or to determine a fact in issue," N.C.G.S. § 8C-1, Rule 702, and that the trial court erred by not admitting it, we nevertheless conclude that the error in this instance was not prejudicial. Dr. Warren was allowed to testify about defendant's mental state at the time of the murders, testimony which indicated that defendant did not form the specific intent to kill. We are convinced that even if Dr. Warren had given his opinion that defendant "snapped," the jury verdicts in this case would not have been different. *See* N.C.G.S. § 15A-1443(a) (1988). Accordingly, we reject defendant's final argument. Defendant received a fair trial, free of prejudicial error.

NO ERROR.