STATE OF NORTH CAROLINA v. CHRISTOPHER WAYNE LIPPARD

No. COA01-735

(Filed 3 September 2002)

**1. Constitutional Law— right to counsel—Sixth Amendment—adversary proceedings not begun**

A murder defendant's Sixth Amendment right to counsel was not violated where he was interviewed in New Orleans by North Carolina detectives without his attorney present even though his attorney had asked that defendant not be interviewed. Defendant had been arrested but not indicted and his Sixth Amendment right to counsel had not attached. Moreover, defendant had knowingly waived his rights; the State's provision of constitutionally sufficient information will not be defeated because a defendant does not fully appreciate the ramifications.

**2. Evidence— motion to suppress—findings and conclusions delayed**

There was no prejudicial error in a murder prosecution where the court entered its findings and conclusions on a motion to suppress long after the suppression hearing. Defendant's contention that the delay affected his decision to testify was unsupported by the record.

**3. Constitutional Law— right to counsel—not invoked**

There was no error in a murder prosecution where defendant contended that an officer continued to question him after he invoked his right to counsel. Defendant stated that he didn't know whether he needed a lawyer, the officer responded that he wanted to leave his statement as it was, the officer reviewed his notes with defendant and did not ask further questions, the state-

ment was typed, and defendant reviewed it, made changes, and signed it.

**4. Criminal Law— remark to juror by deputy—mistrial denied**

The trial court did not abuse its discretion by not declaring a mistrial in a murder prosecution where a deputy made a derogatory remark to an alternate juror about defendant's medical expert. The alternate juror was discharged, the remaining jurors examined, and the court found that there was nothing to indicate that any juror had been impaired.

**5. Evidence— pathologist's testimony—number of gunshot wounds—speculative**

The trial court did not err in a murder prosecution by allowing into evidence a pathologist's testimony that the victims had been shot more than once where defendant maintained that the testimony was speculative. The pathologist was more qualified than the jury to formulate an opinion about the number of gunshot wounds suffered by the victims.

Appeal by defendant from judgments entered 28 July 2000 by Judge James U. Downs in Haywood County Superior Court. Heard in the Court of Appeals 17 April 2002.

*Attorney General Roy Cooper, by Special Deputy Attorney General Norma S. Harrell, for the State.*

*McKinney & Tallant, P.A., by Zeyland G. McKinney, Jr., for defendant appellant.*

McCULLOUGH, Judge.

Defendant Christopher Lippard was tried before a jury at the 21 July 2000 Criminal Session of Haywood County Criminal Superior Court after being charged with four counts of first-degree murder and one count of second-degree murder. Evidence for the State showed defendant met Chad Watt in mid-September 1999. On the morning of 29 September, defendant and Watt had been drinking and looking for marijuana. Defendant and Watt went to Mark Stout's house and picked up Stout and his friend, Charles Roache. While defendant was driving Watts' car, he ran over something and punctured the car's gas tank. When Watt became upset about the damage, Roache and Stout beat him and threw him in the trunk of the car. Defendant drove to a wooded area where Roache hit Watt with a shotgun and, according to

defendant, broke Watt's neck. Roache shot Watt in the eye, and defendant shot Watt in the head. The three men buried Watt in the woods and got a ride to Roache's house and Stout's house.

The men left the shotgun at Stout's house and put their clothes in a bag, which they later threw in a dumpster at a fish camp. Defendant returned to his grandparents' house and spent the night there. The next morning, defendant stole a 1970 Ford truck and went to Stout's house. Stout, defendant and Roache went to Wal-Mart, where defendant and Roache stole two pairs of boots. The men also stole a license plate from a similar truck in the parking lot. Stout gave defendant and Roache a sawed-off .20-gauge shotgun, ammunition, and a can of mace. As defendant and Roache left the area, they stole items from several vehicles and bought beer. They also stopped at a rest area and tried to rob a man, but he did not have a wallet.

The two traveled to Haywood County, situated near the North Carolina-Tennessee border, and exited Interstate 40 at Jonathan Creek. As defendant attempted a three-point turn, he backed the truck over a roadside embankment and was unable to get out. Defendant and Roache began walking down Rabbit Skin Road and looked for a car to steal. As the two walked along Earl Lane, they discovered the home of Earl and Cora Phillips.

Roache entered the house first, while defendant remained outside. Upon hearing screams and gunshots, defendant entered the house and saw Earl and Cora Phillips on the living room floor. Roache demanded guns, money, and car keys and searched for those items while defendant took $50.00 from Mr. Phillips' wallet. Defendant put his hands on Mrs. Phillips' head to quiet her, and Roache shot her in the head. Defendant's shirt was covered with blood spatter from the wound. Roache shot Mr. Phillips in the head; he and defendant stole Mr. Phillips' Ford truck then left the house. Defendant lost control of the vehicle and flipped it a short distance from the house.

Defendant and Roache returned to the Phillips house to find another car to steal. As they stood in the yard, the Phillips' son Eddie grabbed defendant by the hair and the two fought. Roache shot Eddie, then went into the house alone. Defendant followed Roache inside after hearing more screams and gunshots and saw the body of Mitzi Phillips, Eddie's wife, in the kitchen. Defendant and Roache stole a maroon Saturn and soon wrecked it on Interstate 40. The two then split up. Defendant was befriended by Mr. Ricky Prestwood shortly after the murders. Mr. Prestwood bought defend-

ant some clothes at the Salvation Army, let him wash his bloody clothes with Clorox and Dawn, and let him stay at his campsite overnight. The next day, Mr. Prestwood purchased a bus ticket to New Orleans for defendant and took him to the bus station.

Police were dispatched to the Phillips home at 9:59 p.m. Once there, they discovered the bodies of Earl and Cora Phillips in the living room of their home. The bodies of Mitzi Phillips and Eddie's and Mitzi's youngest daughter Katie Phillips were found in other rooms of the house. Eddie Phillips' body was found on the side of the road close to his parents' house. When he was discovered by a neighbor, he was still alive and tried to speak; however, he died shortly thereafter. Police found a Ford truck off Rabbit Skin Road, and also discovered Earl Phillips' Ford wrecked and lying upside down a short distance from the home. Witnesses saw two white men driving Mitzi Phillips' maroon Saturn at a high rate of speed. The car was headed toward Tennessee.

The officers collected shotgun shells and DNA evidence. The shells at the murder scene and near the stolen vehicles were fired from guns found in the maroon Saturn and near the Phillips home. Shells were found in all three vehicles. Defendant's DNA was found on the sawed-off shotgun retrieved from the Saturn.

On 1 October 1999, Roache was arrested near the Phillips home. He made an inculpatory statement to State Bureau of Investigation (SBI) agents admitting he shot the five members of the Phillips family, though he maintained two of the victims "were already dead" when he shot them. Roache also told the agents that defendant was with him at the Phillips home. Defendant was promptly charged with five counts of first-degree murder and a manhunt ensued. On 8 October 1999, defendant was apprehended in New Orleans and taken into custody by Louisiana authorities. Extradition proceedings were instituted against defendant pursuant to the Uniform Criminal Extradition Act; Louisiana counsel was appointed for him during those proceedings.

On 12 October 1999, defendant was interviewed by SBI Agent Toby Hayes in New Orleans. Though defendant learned his family had contacted a North Carolina lawyer for him, he told investigators that he did not need a lawyer and proceeded to give his statement to Agent Hayes. Defendant stated he shot the old lady (Cora Phillips) once, but she was already dead; later, he stated he did not know if he shot anyone. Defendant specifically told Agent Hayes he did not kill anyone

and wanted to talk to the officers. Agent Hayes typed a statement based on his interview with defendant. Defendant read it, made some changes, and signed it. In the final statement, defendant insisted he did not shoot anyone or did not remember shooting anyone. Agent Hayes read the statement into evidence at trial.

During the trial, the State presented thirty-one witnesses, including Dr. John Butts, the Chief Medical Examiner for the State of North Carolina. Dr. Butts testified regarding the autopsies he performed on the victims. Defendant also put on medical evidence and presented a total of eleven witnesses. Defendant testified on his own behalf and stated that he thought Chad Watt was already dead as a result of Roache's shot and a broken neck, but he shot him anyway because Roache told him to do so and he did not want Watt to suffer. Defendant maintained he consumed more beer than Roache did and did not remember what happened. He did, however, contend that Roache masterminded the murders of the Phillips family. Defendant stated he entered the Phillips home after he heard gunshots, and admitted he held Cora Phillips' head down to quiet her and may have hit her head on the floor. Defendant denied taking money out of Earl Phillips' wallet. He also stated he saw Roache shoot both Earl and Cora Phillips. Defendant denied remembering that he fought with Eddie Phillips or saw Roache shooting Eddie, but he did remember being thrown to the ground and having his hair pulled. Defendant contended he never re-entered the house and never saw Mitzi or Katie Phillips. Defendant did not recall being in the maroon Saturn, but he did not deny it.

After receiving instructions from the trial court, the jury found defendant guilty of four counts of first-degree murder and one count of second-degree murder. Though defendant was tried capitally, the jury did not recommend the death penalty. The trial court sentenced defendant to four consecutive life terms for the first-degree murder convictions, and 220-273 months' imprisonment for the second-degree murder conviction. Defendant appealed.

On appeal, defendant argues the trial court erred by (I) denying his motion to suppress his statement; (II) refusing to declare a mistrial or to give curative instructions to the jury after it was disclosed that a jury officer commented on defendant's expert witness in the presence of the jury and an alternate juror talked with other jurors about newspaper accounts of the trial; and (III) allowing into evidence testimony from Dr. John Butts concerning the number of wounds suffered by Earl and Cora Phillips. For the reasons set

forth herein, we disagree with defendant's arguments and conclude he received a trial free from error.

## Motion to Suppress

**[1]** By his first assignment of error, defendant argues the trial court erred by allowing into evidence his statement to Agent Hayes concerning the murders of the five victims in this case. Specifically, defendant contends his Sixth Amendment right to counsel was violated when he was interviewed in New Orleans without his attorney present. He also maintains his rights under the Uniform Criminal Extradition Act and N.C. Gen. Stat. § 15A-734 (2001) were violated because he was arrested without a warrant, outside the State of North Carolina, and in violation of the Act. We do not agree.

Defendant gave a statement to Agent Hayes in New Orleans on 12 October 1999. Arrest warrants from North Carolina had already been issued for him on 4 October 1999, but no indictments were issued until 18 October. Defendant was taken into custody on 8 October 1999 pursuant to the North Carolina warrants and the Uniform Criminal Extradition Act; he subsequently waived extradition. Defendant's stepmother contacted Attorney Stephen Lindsay and asked him to represent defendant; defendant's father later ratified his wife's actions. Additionally, Judge Zoro Guice of the Haywood County Superior Court contacted Mr. Lindsay and requested that he accept appointment as counsel for defendant. Both Mr. Lindsay and Attorney Sean Devereux entered Notices of Appearance in Haywood County Superior Court on 12 October 1999.

Mr. Lindsay contacted the SBI, the New Orleans Assistant District Attorney, and the New Orleans Office of the Public Defender. He asked these individuals and entities not to question defendant or communicate with him about the case. Mr. Lindsay did not speak to defendant until 14 October 1999. Despite this fact, Agent Hayes and Detective Steve Allen of the Haywood County Sheriff's Department flew to New Orleans on 12 October 1999, interviewed defendant and obtained his statement. Defendant contends these actions violated his Sixth Amendment right to counsel because he was interviewed without his attorney present. We do not agree.

The Sixth Amendment right to counsel attaches only "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417

(1972); *State v. Franklin*, 308 N.C. 682, 688, 304 S.E.2d 579, 583 (1983), *overruled on other grounds by State v. Parker*, 315 N.C. 222, 337 S.E.2d 487 (1985). In the recent case of *State v. Taylor*, 354 N.C. 28, 550 S.E.2d 141 (2001), *cert. denied*, 535 U.S. 934, 152 L. Ed. 2d 221 (2002), our Supreme Court held that a suspect in custody in another state pursuant to the Uniform Criminal Extradition Act may be questioned in the other state at the officers' initiative without violating the suspect's constitutional rights to counsel. In the present case, it is undisputed that, at the time of defendant's interview and statement, no indictment had been drawn and no formal proceedings had been initiated against him. The fact that defendant had been arrested did not mean his Sixth Amendment right to counsel had attached. On this point, the *Taylor* Court stated:

> An arrest warrant for first-degree murder in this state is not a formal charge as contemplated under *Kirby*. Defendant's Sixth Amendment right to counsel did not attach either at the issuance of the warrant or at the time of his arrest upon the warrant following his return to North Carolina.

*Id.* at 36, 550 S.E.2d at 147. We further note that "[w]ithout any attachment of the Sixth Amendment right to counsel, a suspect is free to waive the rights available to him under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), and its progeny." *Taylor*, 354 N.C. at 38, 550 S.E.2d at 148.

The United States Supreme Court has also held the Sixth Amendment right to counsel does not attach simply because an attorney may be acting for a defendant and trying to insulate him from questioning by law enforcement. *Moran v. Burbine*, 475 U.S. 412, 89 L. Ed. 2d 410 (1986). "[A] defendant's right to counsel is personal to him. He may waive this right although his attorney has instructed the investigating officers not to talk to him." *State v. Peterson*, 344 N.C. 172, 179, 472 S.E.2d 730, 733-34 (1996). Despite the fact that Mr. Lindsay asked law enforcement officers to refrain from questioning defendant, defendant was free to waive his right and speak to the officers. Thus, the main question for our review is whether defendant's statement was validly obtained.

> A defendant's waiver is valid if it is determined that his decision not to rely on his rights was not the product of coercion, that he was aware at all times that he could remain silent and request counsel, and that he was cognizant of the intention of the prosecution to use his statements against him.

*State v. Barnes,* 345 N.C. 184, 243, 481 S.E.2d 44, 77 (1997), *cert. denied by Chambers v. North Carolina,* 522 U.S. 876, 139 L. Ed. 2d 134 (1997), and *cert. denied by Barnes v. North Carolina,* 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). In the present case, Agent Hayes read defendant the standard *Miranda* warnings and informed defendant that he had an attorney in North Carolina. Agent Hayes testified:

> [W]e advised Mr. Lippard of his rights and went as far as to tell him that we understood that he had been appointed attorneys in Asheville or in North Carolina to represent him and he indicated that he had no reason to speak with any court appointed attorney at this point and time.

Agent Hayes also testified defendant was not in distress, was not under the influence of drugs or alcohol, and answered all questions intelligently. When the officers informed defendant that they wanted to talk to him about the Haywood County murders, "he immediately replied that he did not need any attorney, that he saw some thing[s]— that he didn't kill anyone, but he saw some things." The evidence of record indicates defendant knowingly and intelligently waived his rights and voluntarily consented to discuss the murders with law enforcement officers. "[E]vidence indicating that the accused did not fully appreciate the ramifications resulting from the waiver will 'not defeat the State's showing that the information it provided to him satisfied the constitutional minimum.' " *Barnes,* 345 N.C. at 243, 481 S.E.2d at 77 (quoting *Patterson v. Illinois,* 487 U.S. 285, 294, 101 L. Ed. 2d 261, 273 (1988)). We conclude defendant's statement was validly obtained.

[2] Defendant also maintains his statement should have been suppressed because the trial court's findings of fact and conclusions of law were entered long after the suppression hearing, while the jury deliberated. Defendant contends the trial court's actions amounted to a summary denial of his motion to suppress and constituted a violation of N.C. Gen. Stat. § 15A-977(d) (2001). However, our appellate courts have repeatedly held that a delay in the entry of findings of fact and conclusions of law does not amount to prejudicial error. *State v. Horner,* 310 N.C. 274, 311 S.E.2d 281 (1984).

> Where the trial judge makes the determination [on a motion to suppress] after a hearing, as in this case, he must set forth in the record his findings of fact and conclusions of law. N.C. Gen. Stat. § 15A-977(d), (f) (1983). Findings and conclusions are required in order that there may be a meaningful appellate review of the deci-

sion. The statute does not require that the findings be made in writing at the time of the ruling. Effective appellate review is not thwarted by the subsequent order.

*Id.* at 279, 311 S.E.2d at 285. *See also State v. Ainsworth,* 109 N.C. App. 136, 151-52, 426 S.E.2d 410, 419 (1993). Upon review of the record, we do not believe defendant has shown prejudice from the delay. First, defendant failed to assign error to the trial court's findings of fact. Thus, "they are conclusive and not reviewable on appeal." *Barnes,* 345 N.C. at 245, 481 S.E.2d at 78; *State v. Watkins,* 337 N.C. 437, 438, 446 S.E.2d 67, 68 (1994). Second, though defendant contends the delay prejudiced his case because he had no time to review the information before deciding whether to testify during trial, his contention is unsupported by the record.

[3] Finally, defendant argues that, despite his initial waiver, he invoked his right to counsel during the interview, but Agent Hayes continued to question him. Agent Hayes testified that, in the latter portion of the interview, defendant took a break and stated "he didn't know if he needed a lawyer." Agent Hayes told defendant "that was a decision that was solely his to make and he could either continue without a lawyer or he could terminate the interview at that point." When it was time to resume the interview, defendant "indicated that he wanted to leave his statement like it was prior[.]" Agent Hayes reviewed his notes with defendant and did not ask any further questions. The statement was later typed and defendant reviewed it. He made some changes, then signed the typed statement.

After examining the totality of the circumstances, the trial court concluded defendant waived his right to counsel and that his statement was voluntary. The trial court also made findings of fact and conclusions of law to that effect. We discern no error in those findings of fact and conclusions of law, nor do we perceive any prejudice to defendant. Defendant's first assignment of error is overruled.

### Remarks of Jury Officer

[4] By his second assignment of error, defendant contends the trial court erred by refusing to declare a mistrial or give curative instructions to the jury with regard to remarks of a jury officer who commented on defendant's witnesses.

Just before the jury charge, one of the jurors informed the trial court that she had received several calls at her home the previous evening from the alternate juror, Mr. Lee. The trial court examined

Mr. Lee outside the presence of the other jurors. Mr. Lee informed the trial court that "[w]e have one of the sheriffs out here that's saying things that I don't feel that should be said out here to the jury." Specifically, Mr. Lee stated Deputy Parris said that if one person typed something, "they can pay somebody enough money to say that something was wrong with it," and "some of the people who testified for the defense were paid to say what—were here to say because they were paid." Mr. Lee believed the statements were made in reference to defendant's medical expert, Dr. Hudson. Mr. Lee then told Deputy Parris, "that's your opinion, that, you know, someone like this was hired[,]" and Deputy Parris responded with a derogatory remark. Mr. Lee informed the trial court that this exchange took place just after Dr. Hudson testified, and he believed about half the jurors were present when the remarks were made.

The trial court brought the jury back to the courtroom and asked them whether they heard Deputy Parris' remarks. Three jurors responded affirmatively. The trial court questioned each of the three jurors and allowed both the State and defendant to question them. Each of the jurors stated they were not influenced by the comments and could make a fair and impartial decision after the presentation of all the evidence.

The trial court then asked the rest of the jurors whether they recalled the conversation or heard Deputy Parris' comments about the trial. None of the jurors responded affirmatively. The State argued that Mr. Lee initiated the conversation with Deputy Parris and failed to follow the trial court's directions. The trial court discharged alternate juror Lee, then asked whether any of the jurors recalled Mr. Lee talking with them about newspaper accounts or news broadcasts regarding the case. One juror responded affirmatively. The juror related his discussion with Mr. Lee, but stated that Mr. Lee's comments did not influence him and he believed he was able to follow the trial court's instructions and render a fair and impartial decision at the conclusion of all the evidence.

The trial court made findings of fact regarding Mr. Lee, Deputy Parris, and the jurors. The trial court specifically found that if any misconduct occurred, "it was between [Deputy Parris] and Mr. Lee." The trial court also found and concluded that

> there is nothing before the court that any juror has been impacted by any of the matters brought before the court this morning; and that all have stated they are of a fair and impartial mind and can

continue to give this case their attention and their impartiality and fairness in accordance with their oath until it's concluded.

The trial court denied defendant's motions to dismiss and for a mistrial, and refused to give special instructions with regard to compensation of an expert. The trial court did, however, give an instruction about consideration of an expert's testimony, based on the pattern jury instructions.

The trial court has the power to declare a mistrial pursuant to N.C. Gen. Stat. § 15A-1061 (2001), which states:

Upon motion of a defendant or with his concurrence the judge may declare a mistrial at any time during the trial. The judge must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case.

Defendant argues the trial court should have granted his motion for a mistrial because Deputy Parris' and Mr. Lee's comments were made just after defendant's medical expert, Dr. Hudson, testified. The testimony was critical to the case because Dr. Hudson opined that each victim was shot only once, thereby corroborating defendant's position that he was not a willing participant in the murders.

As previously noted, upon learning of the alleged misconduct, the trial court made a proper inquiry and determined that none of the jurors had been improperly influenced by the conversations involving Mr. Lee and Deputy Parris.

"In North Carolina, in instances when the contention was made by the defendant that the jury has been improperly influenced, it has been held that it must be shown that the jury was actually prejudiced against the defendant, to avail the defendant relief from the verdict, and the findings of the trial judge upon the evidence and facts are conclusive and not reviewable."

*State v. Bonney*, 329 N.C. 61, 83, 405 S.E.2d 145, 158 (1991) (quoting *State v. Hart*, 226 N.C. 200, 203, 37 S.E.2d 487, 489 (1946)). In the present case, defendant has not shown that any of the jurors were influenced by the alleged misconduct, and he is therefore not entitled to a mistrial. *See State v. Brown*, 335 N.C. 477, 488, 439 S.E.2d 589, 596 (1994). The decision to declare a mistrial lies within the sound discretion of the trial court and will be reversed only upon a

showing of a manifest abuse of discretion. *State v. Perkins*, 345 N.C. 254, 277, 481 S.E.2d 25, 34, *cert. denied*, 522 U.S. 837, 139 L. Ed. 2d 64 (1997). We also note that " '[m]isconduct is determined by the facts and circumstances in each case. The trial judge is in a better position to investigate any allegations of misconduct, question witnesses and observe their demeanor, and make appropriate findings.' " *State v. Harris*, 145 N.C. App. 570, 576, 551 S.E.2d 499, 503-04 (2001) (quoting *State v. Drake*, 31 N.C. App. 187, 190, 229 S.E.2d 51, 54 (1976)), *appeal dismissed, disc. review denied*, 355 N.C. 218, 560 S.E.2d 146 (2002).

The trial court examined the jurors about the alleged misconduct and found as a fact that there was no evidence to support defendant's allegation of prejudice to his case. The trial court's findings of fact were supported by substantial evidence and, in turn, supported the conclusions of law and the subsequent denial of the motion for a mistrial. Because we discern no error or abuse of the trial court's discretion in denying defendant's motion for a mistrial, defendant's second assignment of error is overruled.

## Medical Testimony

**[5]** By his final assignment of error, defendant contends the trial court erred by allowing into evidence the testimony of Dr. John Butts regarding the possibility that Earl and Cora Phillips were each shot more than once. Defendant maintains Dr. Butts' testimony was merely speculative and unsupported by the autopsies, as he was unable to find more than one exit wound on either Earl or Cora Phillips. We disagree.

Dr. Butts was tendered by the State as an expert in forensic pathology. He testified, over objection, that he noted defects in the palates of both Earl and Cora Phillips when he performed their autopsies. Based on the round shape of the holes and other factors, Dr. Butts testified there could have been second gunshot wounds inflicted upon each of them. Dr. Butts readily stated he was not certain that second gunshot wounds were sustained by the victims. With regard to Earl Phillips, Dr. Butts stated the first bullet did not account for the wound on Mr. Phillips' palate. With regard to Cora Phillips, Dr. Butts testified the damage to her head from the gunshot wound was so extensive he was unable to tell whether there had been one or two bullets fired into her head.

Defendant argues Dr. Butts' testimony was speculative and inadmissible. However, Dr. Butts was testifying in his area of expertise,

was more qualified than the jury to formulate an opinion regarding the number of gunshot wounds suffered by the victims, and was allowed to testify to his opinions about matters that could not be determined with certainty. Dr. Butts' testimony was the result of his expert observations and his performance of the autopsies on Earl and Cora Phillips.

Upon review, we believe Dr. Butts' testimony constituted permissible opinion testimony under N.C. Gen. Stat. § 8C-1, Rule 702(a) (2001), which states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

Furthermore,

> [t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

N.C. Gen. Stat. § 8C-1, Rule 703 (2001). These rules of evidence have been applied in *State v. Eason*, 328 N.C. 409, 422, 402 S.E.2d 809, 815 (1991) (expert allowed to testify that a fire was intentionally set, where his conclusion was based upon the elimination of any accidental source for the fire); and *State v. Cummings*, 346 N.C. 291, 320, 488 S.E.2d 550, 567 (1997), *cert. denied*, 522 U.S. 1092, 139 L. Ed. 2d 873 (1998) (forensic pathologist allowed to testify a victim's wound was consistent with his being shot while seated even though the pathologist was not present and could not say with certainty that the victim was seated when shot).

The fact that there was uncertainty about whether the victims suffered one or two shots each went to the weight of the evidence, not its admissibility. *State v. Reynolds*, 307 N.C. 184, 197, 297 S.E.2d 532, 540 (1982). Finally, even if the evidence was improperly admitted, defendant has not shown prejudicial error. *See* N.C. Gen. Stat. § 15A-1443(a) (2001); and *State v. Chavis*, 141 N.C. App. 553, 566, 540 S.E.2d 404, 414 (2000). Lastly, we note defendant presented no evidence that the jury convicted him based on the medical testimony of

possible second gunshot wounds to Earl and Cora Phillips. The jury convicted defendant of the murders based on the felony-murder rule, with first-degree kidnapping, first-degree burglary, and armed robbery as the underlying felonies. Defendant's final assignment of error is overruled.

After careful review of the record and the arguments of the parties, we conclude defendant received a fair trial, free from prejudicial error.

No error.

Judges WYNN and BIGGS concur.